Dudley J. GODFREY, Jr.

v.

The UNITED STATES.

Gerald J. KAHN

v.

The UNITED STATES.

Gilbert PALAY

v.

The UNITED STATES.

Nos. 365–77 to 367–77.

United States Claims Court.

Oct. 12, 1983.

James A. Urdan, Milwaukee, Wis., for plaintiffs.

Stuart M. Fischbein, Washington, D.C., with whom was Asst. Atty. Gen. Glenn L. Archer, Jr., Washington, D.C., for defendant.

## OPINION

YOCK, Judge.

This case comes before the Court on plaintiffs' complaints seeking to recover $150.00 each, remitted to the Internal Revenue Service (IRS) in June 1977 as partial payment of a 100 percent tax penalty as-

sessed by the IRS against the plaintiffs individually pursuant to section 6672 of the Internal Revenue Code of 1954. The defendant has answered and counterclaimed for the respective unpaid balances of the penalties with respect to each of the three separate plaintiffs involved in these consolidated cases.

The $191,734.68 penalty assessed represents an administrative determination that each of the plaintiffs was required, and had willfully failed, to pay over to the IRS certain income and Federal Insurance Contributions Act (FICA) taxes that had been withheld from the wages of employees of Career Academy, Inc., during the period July 1, 1974 through December 11, 1974.

## I. Liability of Plaintiffs for Section 6672 Tax Penalty

### Facts

Career Academy, Inc. (Career), was organized as a Delaware corporation engaged in the business of operating home-study and resident schools in vocational training fields including radio broadcasting, medical and dental assisting, architectural and engineering drafting, hotel-motel training, and airline personnel and travel. Many of Career's schools were operated through wholly owned subsidiaries, including Lewis Hotel-Motel Schools, Inc., which operated a hotel training school, and Humboldt Institute, Inc., which operated a school for the training of airline and travel personnel.

Career was founded by Wesley D. Pavalon, who was at all times Career's largest stockholder. Mr. Pavalon served as president and chairman of the board of Career until May 13, 1969, when he resigned the presidency. He resumed the office of president on August 18, 1970, and served until June 30, 1972, when he resigned from both positions following financial reversals suffered by Career. Although it was initially a privately held corporation, Career ultimately went public and made several offerings of common stock. Its shares were listed on the American Stock Exchange until August 14, 1972, after which its shares were publicly traded in the over-the-counter market. As of May 28, 1974, Career's stock was registered in the names of 6,992 separate stockholders with 4,646,099 shares outstanding. There was minimal public trading of Career stock during 1974 and the bid price for purchase of the stock during 1974 ranged from a high of 13 cents per share to a low of 1 cent per share. In its heyday, Career stock sold for as high as $58 per share.

Plaintiff, Dudley J. Godfrey, Jr., was elected a director of Career on August 18, 1970, and was elected to replace Mr. Pavalon as chairman of the board on June 30, 1972. Mr. Godfrey continued to serve in these capacities until Career's bankruptcy. He also served as chairman of Career's executive committee, although the executive committee held no meetings after May 1973. Plaintiff Godfrey, who is a law partner of plaintiff Kahn, agreed to become chairman of the board in order to provide consultation and advice concerning Career's financial and personnel problems. In his testimony, Mr. Godfrey referred to his becoming chairman of the board as being "drafted" for the role. Mr. Godfrey received no salary from Career and had no office at Career. He was and still is engaged in the full-time practice of law with the law firm of Godfrey & Kahn, S.C., in Milwaukee, Wisconsin, a firm he helped found with Mr. Kahn in 1958. The firm is considered primarily a business law firm with special expertise in tax matters. In 1974, Mr. Godfrey owned 59,716 shares or 1.29 percent of Career's outstanding shares of stock.

Plaintiff, Gerald J. Kahn, was elected as both a director and the secretary of Career in 1961 and served in these capacities until Career filed for bankruptcy on December 12, 1974. He also served on Career's executive committee. Plaintiff Kahn received no salary for his services, as either a director or as the secretary of Career, and did not have an office at Career. He was and still is engaged in the full-time practice of law with the law firm of Godfrey & Kahn, S.C. In the course of his law practice, Mr. Kahn periodically performed various legal services for Career. The law firm of Godfrey &

Kahn billed Career approximately $57,000 for legal work done in 1974. As of December 31, 1974, the balance due the firm for work done for Career in 1974 and previous years was $152,116.23. In 1974, Mr. Kahn owned 62,439 shares or 1.34 percent of Career's outstanding shares of stock.

Plaintiff, Mr. Gilbert Palay, became a director of Career on May 14, 1968, and continued to serve as a director until its bankruptcy. He also served on Career's executive committee. He was, however, unlike plaintiffs Godfrey and Kahn, never an officer of Career. Mr. Palay received no salary from Career and had no office at Career. In addition to his duties as a director, Mr. Palay performed certain financial consulting and auditing services for Career until May 1971, as a certified public accountant with the accounting firm of Zettey and Palay. After 1971, neither Mr. Palay nor his firm performed any services for Career. As of May 1972, Career owed the firm of Zettey and Palay some $18,310, which amount was written off as a bad debt at that time. In 1974, Mr. Palay owned 6,200 shares or 0.13 percent of Career's outstanding shares of stock.

None of the three plaintiffs herein ever signed any checks of Career or its subsidiaries, nor were any of the plaintiffs ever designated by the board of directors as an authorized check signer for Career or its subsidiaries. The board of directors and the executive committee of the board did pass resolutions from time to time delegating authority to establish bank accounts and did designate signatory authority to the president and treasurer of Career. None of the plaintiffs ever signed any IRS 941 Forms or other payroll or tax returns of Career and none participated in any way in the preparation of such returns or in the preparation of any payrolls for Career.

Together, the three plaintiffs constituted a majority of Career's board of directors, which consisted of four members, during the 1973–74 time frame at issue. As directors of Career, plaintiffs exercised the authority over Career given to them by the bylaws. They elected officers, hired or approved the hiring of top level consultants, delegated authority to establish bank accounts, and designated signatories for those accounts. They also authorized borrowing by officers on behalf of the corporation, authorized major sales programs, ratified and approved settlements made by officers, approved loan agreements made with various banks and approved a recapitalization agreement with American Management Services, Inc. Finally, they authorized the filing of Career's Chapter XI bankruptcy petition.

Following Mr. Pavalon's departure as president and chairman of the board for Career in 1972, Mr. Godfrey was appointed as chairman of the board. He immediately began searching for a president, which he located in the person of Mr. Malcolm Houghton. Mr. Houghton became president in June 1972 and served until September 1973 when he was replaced as president by Mr. Joseph P. Maher. Also at this same time, Mr. Joseph L. Ferrare was elected executive vice-president of Career. Upon Mr. Houghton's departure, Mr. Godfrey was instrumental in securing a two-month consulting contract for him with Career, apparently to ease the pain of his departure.

Mr. Terrence J. Metzdorff first became involved with Career in late 1972 when he was hired as Career's controller by Mr. Leo Thompson, then treasurer of Career. In November 1972, Mr. Metzdorff was promoted to be the chief financial officer of Career. In addition to being the controller, he was elected assistant treasurer on November 21, 1972, and was elected vice-president/treasurer on March 1, 1974. Mr. Metzdorff never owned, either directly or beneficially, any stock in Career and was never a director of the corporation. He did, however, attend board meetings through 1974. Mr. Metzdorff, as well as Mr. Ferrare, was authorized to sign checks on behalf of Career, including checks for payment of withholding taxes and to prepare Career's Form 941 withholding tax returns.[1]

1. In an earlier action before the United States District Court for the Eastern District of Wis-

As earlier indicated, Mr. Joseph L. Ferrare was elected executive vice-president of Career on September 10, 1973. Prior to that time, he had been both a franchised regional director of Career and a national sales manager of Lewis Hotel-Motel Schools, Inc., in Washington, D.C. On March 1, 1974, when Mr. Maher resigned as president, Mr. Ferrare was elected as both president and a director of Career by the board of directors, and continued to serve in those positions throughout the two tax quarters at issue. He never owned, either directly or beneficially, any stock in Career. During 1973 and 1974, Mr. Ferrare was a resident of Maryland, and commuted to Milwaukee to attend Career board meetings. He was in regular telephone contact with the financial office employees in Milwaukee, including Mr. Metzdorff with whom he consulted concerning the issuance of checks to pay creditors of Career, including the Internal Revenue Service. Mr. Ferrare maintained an office in Washington, D.C., at the headquarters of Career's subsidiary, Lewis Hotel-Motel School, Inc., and generally performed his duties as president of Career at this office. Together with Mr. Metzdorff, he was authorized to sign checks for Career, including checks to the Internal Revenue Service for employment taxes.[2]

Career sustained substantial losses in each of its last five years of operation. It was in default since November 1972, in making semi-annual interest payments of approximately $341,000 each, due in May and November of each year on a total of $12,000,000 of 5½-percent and 6-percent convertible subordinated notes held by Chemical Bank and United States Trust Company of New York. In June 1973, Career issued 5½-percent and 6-percent notes to the two banks in the aggregate principal amount of $682,498 in lieu of interest payments on its convertible subordinated notes which were due in November 1972 and May

1973. Career also defaulted in making interest payments under these notes. For these reasons, various discussions were held by Mr. Godfrey and other members of the operating management with lenders, potential lenders, prospective buyers, and potential investors. These efforts ultimately led to the negotiation of a loan agreement and recapitalization agreement with American Management Services, Inc. (AMS), whose principal was a Mr. Brian Gordon.

Mr. Gordon was a financier/investor living in the Washington, D.C. area who had been involved in running several schools. Mr. Ferrare had become acquainted with Mr. Gordon when he was hired to serve as a consultant for one of Gordon's schools. Later, when Career was trying to sell a school building in Washington, D.C., Mr. Ferrare first introduced Mr. Gordon to Mr. Godfrey. Mr. Gordon eventually bought the building from Career, and from this transaction became aware of Career's financial needs and of the possibility of purchasing several of Career's subsidiary schools. While Mr. Gordon was never able to negotiate with Mr. Godfrey for the sale of any subsidiary schools, he did become interested in purchasing or investing in the entire Career school system. Apparently Mr. Gordon viewed Career as having turnabout investment potential, especially if he were in effect the sole owner.

In any event, on August 30, 1973, Career entered into a letter of intent with AMS, the Chemical Bank and the United States Trust Company of New York pursuant to which the banks would transfer the defaulted notes to AMS in exchange for 25 percent of the common stock of AMS and the note of AMS for $1,300,000. AMS would then surrender to Career all but $1,300,000 in principal amount of the convertible subordinated notes and the notes for unpaid inter-

---

consin, Mr. Metzdorff was determined, by stipulated agreement of the parties, not to be liable for the tax penalty involved herein.

**2.** Mr. Ferrare, in an earlier stipulation approved by this Court, admitted liability for the identical tax penalty which defendant is claiming from the plaintiffs here. The Court notes that any amounts recovered from Mr. Ferrare must be applied by the Internal Revenue Service in offsetting the section 6672 tax penalty which the IRS has counterclaimed for in this action against each individual plaintiff.

est formerly held by the banks. In exchange for AMS's surrender, Career was to transfer to AMS a sufficient number of shares of convertible preferred stock to give AMS an 80 percent equity interest in Career and the right to vote 80 percent of Career's outstanding stock.

As a part of this recapitalization package, Mr. Gordon insisted that he be allowed his choice of people to run the "new" Career. Mr. Godfrey agreed to this proposal and was instrumental in getting the Career board of directors to select Mr. Joseph P. Maher as president and Mr. Ferrare as executive vice-president of Career on September 10, 1973. Immediately prior to this date, Mr. Maher had been president of one of Career's subsidiary schools in Washington, D.C., that being Lewis Hotel-Motel Schools, Inc. Mr. Ferrare had been the national sales manager at Lewis.

Also, as a part of the negotiated transaction, most of the executive offices of Career, plus its home study operations and collection functions, were to be moved to the Washington premises occupied by the Lewis School, in order to reduce operating expenses. Following the transfer of these operations to Washington in the fall of 1973, Career's Milwaukee, Wisconsin, offices consisted primarily of financial offices where the corporate records were maintained and the corporate books were kept. The only operating officer remaining in Milwaukee was Career's assistant treasurer, and later treasurer, Mr. Terrence J. Metzdorff.

On April 22, 1971, Career, represented throughout by Mr. Godfrey, entered into a loan agreement with the Marshal and Isley Bank of Milwaukee, Wisconsin, pursuant to which Career could borrow from the bank up to $3,900,000. The loan agreement provided that the loans would be due and payable on demand if neither Dudley J. Godfrey nor Gerald J. Kahn served as either chairman of the company's executive committee or secretary of the company. As of January 31, 1974, the principal balance owed by Career under this loan agreement was approximately $3,225,000. Career was in default of the agreement, and in both 1973 and 1974 was negotiating with the bank for reinstatement of the loan based upon its recapitalization negotiations with AMS.

In November 1973, Career entered into a further agreement with AMS pursuant to which AMS made available to Career a $1,000,000 line of credit. Career eventually drew $900,000 under this line of credit. After the signing of the letter of intent on August 30, 1973, Career, the banks and AMS negotiated the terms of a definitive agreement incorporating the terms set forth in the letter of intent, and on August 12, 1974, the recapitalization agreement with AMS was executed. However, since the proposed recapitalization required the approval of Career's stockholders, the annual stockholders' meeting scheduled for September 1974 was postponed and proxy materials for the meeting were withdrawn from the Securities and Exchange Commission (SEC). A new stockholders' meeting was then scheduled for action on the proposed recapitalization and revised proxy materials were to be refiled with the SEC.

Throughout the entire period in which the AMS recapitalization proposals were being negotiated and after Mr. Maher and Mr. Ferrare had been installed as officers in September 1973, Career continued to experience serious financial difficulties. The banks were threatening foreclosure, student enrollments continued to decline, and bills were being paid late. In October 1973, in a meeting attended by Mr. Godfrey, Mr. Ferrare and Mr. Andrew Lauritzen,[3] Mr. Metzdorff became so concerned that withholding taxes (income and FICA) were not being paid on a timely basis that he threatened to resign unless he was relieved of responsibility for their nonpayment. In response to this threat, Mr. Ferrare gave Mr. Metzdorff a letter dated October 5, 1973, relieving him

---

3. Andrew R. Lauritzen is an attorney with the law firm of Godfrey & Kahn who, except for his legal work for Career as a member of the Godfrey & Kahn law firm, had no official connection with the corporation.

of responsibility for the nonpayment of Career's payroll taxes. According to Mr. Metzdorff, Mr. Godfrey, upon being appraised of Mr. Metzdorff's concerns, stated that "no one ever goes to jail for not paying taxes, so I wouldn't be too concerned about that." Mr. Ferrare, in corroborating Mr. Metzdorff's testimony, testified that, following this meeting with Mr. Metzdorff, he accompanied Mr. Godfrey and Mr. Lauritzen to see Mr. Daniel Howard, a bankruptcy attorney, concerning Career's generally deteriorating financial condition.

Career's monthly financial reports, which Mr. Metzdorff's office prepared, indicated that withholding taxes in October 1973 were beginning to accrue on the books of the corporation and were being paid late. The December 1973 report showed FICA withholding accrued and unpaid of $9,095 and federal income tax withholding accrued and unpaid of $30,689. The FICA employer position was shown at $100,001. These monthly reports were distributed by Mr. Metzdorff's office to all the corporate officers and to the board of directors.

In the spring of 1974, the accounting firm of Arthur Anderson & Company was asked to do a yearly audit on the books of Career for the fiscal year ending January 31, 1974 (and also the previous fiscal year) in connection with the proposed AMS recapitalization proposal. In a general representation letter in connection with this audit from Career to the Arthur Anderson firm dated June 28, 1974, Mr. Godfrey, as chairman of the board of directors, along with Messrs. Ferrare and Metzdorff, stated that, *inter alia,* "[t]he Company is presently past due in the remittance of Federal and State withholding taxes in the amount of approximately $250,000 as of May 31, 1974." In his testimony at trial, Mr. Godfrey admitted that at the time he signed the letter, he was aware of a substantial delinquency in withholding taxes. In his testimony, Mr. Godfrey stated that he had directed Mr. Lauritzen, rather than any member of the Career operating management structure, to check into the delinquency and to insure that the taxes were paid. Aside from his comments to Mr. Lauritzen, Mr. Godfrey appears to have taken no subsequent affirmative action to investigate further and rectify the situation.

On July 11, 1974, Arthur Anderson & Company transmitted copies of Career's consolidated financial statements as of January 31, 1973 and 1974, together with their auditor's report to Career's treasurer, Mr. Metzdorff. The copies of the consolidated financial statements were then distributed by Mr. Metzdorff to the executive officers of Career and members of Career's board of directors. In the first note of Career's Consolidated Financial Statements, the following statement appears:

> The Company is also in default of its notes payable to bank, certain other notes payable and the notes payable under a credit agreement *and is unable to pay all current obligations, including social security taxes and income taxes withheld from employees.* At January 31, 1974, such tax deficiency approximated $80,000. The Company has not made any payment subsequent to year end and at June 1, 1974, *the deficiency approximates $250,-000; certain monetary penalties can be levied.* [Emphasis added.]

In September 1974, the IRS in Milwaukee advised Mr. Metzdorff that unless Career paid its withholding taxes for the first and second quarters of 1974, it would close the corporation down. Mr. Metzdorff immediately contacted Mr. Ferrare who arranged for a further call down on the AMS revolving credit line from Mr. Gordon. Thereafter, Mr. Metzdorff paid the IRS for the first and second quarter 1974 withholding taxes. No money was paid for the third (nor fourth) quarter withholding taxes that had accrued.

Throughout this entire period of time (October 1973 to December 1974), only those bills that were authorized for payment by Mr. Ferrare would be paid by Mr. Metzdorff. It was the practice during this time for Mr. Metzdorff and Mr. Ferrare to get together approximately once each week to decide which creditors would be paid and which bills would be deferred. Only those

bills that absolutely had to be paid to keep the operation going (payroll, rent, utilities, etc.) would be paid. Mr. Ferrare ran this part of the operation with an iron hand and completely dominated Mr. Metzdorff in this regard.

Also throughout this same period of time, the board of directors would meet approximately every two months. During these meetings, Mr. Ferrare would normally go over the financial picture with the board of directors and Mr. Metzdorff would fill in the details when asked. In the September 1974 board of directors meeting, Mr. Ferrare had presented a very upbeat financial picture indicating that he felt the corporation would shortly turn the corner on profitability after five years of unprofitable operation. He felt this way because of the increased student enrollment contemplated with the start of the new school year and the recapitalization of the corporation almost concluded with Mr. Gordon (AMS).

This euphoria was short-lived, however. On or about November 12, 1974, Mr. Metzdorff called Mr. Godfrey and Mr. Lauritzen to advise them that he was resigning as an officer with Career because he felt there was simply no way the corporation could ultimately survive. Mr. Metzdorff's resignation precipitated a board of directors meeting which was held on November 19, 1974. At that meeting, Mr. Metzdorff's resignation was accepted, although Mr. Godfrey prevailed on him to accept a consulting contract with Career until the future of Career could be decided. The board also directed the review of all assets of the corporation to determine what steps were to be taken.

In late November, AMS notified Career that it did not plan to go forward with the proposed recapitalization transaction. Although Mr. Godfrey tried even at this late date to negotiate other loans from other sources, and the sale of several of Career's subsidiary schools, nothing appeared to work. On December 5, 1974, Mr. Godfrey wrote to Mr. Chavez at the IRS to forestall collection efforts on the delinquent third and fourth quarter withholding taxes. In that letter, Mr. Godfrey indicated that it would be advisable for all creditors to keep Career running so that the assets could be maximized to pay the outstanding taxes and other obligations. Mr. Godfrey requested a deferral of any IRS enforcement action until December 11, 1974.

At the board meeting on December 9, 1974, the board of directors reviewed the hopeless financial condition of the corporation and concluded that some form of insolvency proceedings would soon become necessary if Career was to stay in business and maximize the value of its assets. Two bankruptcy lawyers were present at the meeting to discuss the various options available.

Career filed for an arrangement under Chapter XI of the Bankruptcy Act on December 12, 1974, and was adjudicated bankrupt on April 15, 1975. The IRS filed a claim in Career's bankruptcy proceeding for employment taxes aggregating $210,925.65. After all assets were sold and the proceeds distributed, the IRS received no payment on its claim.

These consolidated actions involve the liability of each of the three plaintiffs for a 100 percent penalty assessed pursuant to section 6672 of the Internal Revenue Code of 1954 with respect to the alleged withholding tax obligations of Career Academy, Inc. The penalty involves income taxes and FICA contributions in the amount of $114,185.28 withheld from employees by Career for the third calendar quarter ending September 30, 1974 and the fourth (short) calendar quarter ending December 11, 1974 in the amount of $77,549.40 for a total amount assessed of $191,734.68.

The penalties were assessed by the IRS Milwaukee office against the plaintiffs on June 13, 1977, following proper notice and a conference held on February 25, 1977. On June 23, 1977, each plaintiff paid the sum of $150 to the District Director representing an amount in excess of income and FICA taxes withheld from one employee of Career, for the quarters involved.

On that same date, each plaintiff filed a claim with the District Director for a re-

fund of the $150 paid and for abatement of the balance of the assessment. Each claim for refund and abatement was denied by the IRS by letter dated June 24, 1977. The balance of each of the assessments, $191,-584.68, remains unpaid. The figure $191,-584.68, therefore, represents the maximum amount the defendant seeks to collect from any one of the three plaintiffs. That figure is to be reduced by payments made by any individual ultimately determined to be liable.

This action for refund followed with the appropriate counterclaims asserted.

### Discussion

Under section 6672 of the Internal Revenue Code of 1954, a tax penalty is allowed against:

Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. * * *.

26 U.S.C. § 6672 (1976).

Section 6671 makes it clear that the person referred to in section 6672 is meant to include the corporate employer's officers. It states:

§ 6671. Rules for application of assessable penalties

*       *       *       *       *       *

(b) Person defined

The term "person", as used in this subchapter, includes an officer or employee of a corporation * * * who as such officer, employee * * * is under a duty to perform the act in respect of which the violation occurs.

*Id.* § 6671(b).

Under the statutory provisions, in order for an individual to be subject to the 100 percent penalty, two separate requirements must be fulfilled. First, the individual must be under a duty to perform the act in respect to which the violation occurs; that is, the individual must be a "responsible person." Second, the individual must have "willfully fail[ed]" to carry out this duty. Both of these requirements must be present in order for the penalty to be imposed. *McCarty v. United States,* 194 Ct.Cl. 42, 53–54, 437 F.2d 961, 967 (1971).

Whether one is a "responsible" officer within the statutory framework depends upon the factual circumstances involved in each case. *See Bauer v. United States,* 211 Ct.Cl. 276, 286, 543 F.2d 142, 148 (1976). Any corporate officer or employee with the power and authority to avoid the default or to direct the payment of the taxes is a responsible person within the meaning of section 6672. *Feist v. United States,* 221 Ct.Cl. 531, 539, 607 F.2d 954, 960 (1979). The courts are looking for that person or those persons who could have seen to it that the taxes were paid. The search is always for a person or persons with the ultimate authority over expenditures of funds, since that person can fairly be said to be responsible for the corporation's failure to pay over its taxes. *White v. United States,* 178 Ct.Cl. 765, 772, 372 F.2d 513, 516 (1967). It has long been recognized that liability is not limited to those who perform the merely mechanical function of preparing the tax forms, collecting the taxes from the wages of the employees and filing the returns. *Harrington v. United States,* 504 F.2d 1306, 1312 (1st Cir.1974); *United States v. Graham,* 309 F.2d 210, 212 (9th Cir.1962). Frequently, employees with responsibility for performing the clerical duties of collecting and paying over the taxes and preparing returns do not have the authority to authorize the payment or to order the nonpayment of the tax. *Feist v. United States, supra,* 221 Ct.Cl. at 539, 607 F.2d at 960. There also can be more than one "responsible officer" at a corporation. *White v. United States, supra,* 178 Ct.Cl. at 771, 372 F.2d at 516. Section 6672 does not confine liability for unpaid taxes to the single officer with the greatest or closest

control or authority over corporate affairs. *Bolding v. United States,* 215 Ct.Cl. 148, 161, 565 F.2d 663, 671 (1977).

■ Likewise, this Court and its predecessor, the Court of Claims, have interpreted the word "willfully," as used in section 6672, as requiring "a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the Government, and that it is not necessary that there be present an intent to defraud or deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness." *White v. United States, supra,* 178 Ct.Cl. at 778–79, 372 F.2d at 521; *see also Marlowe v. United States,* 2 Cl.Ct. 711, 715 (1983) (WHITE, S.J.); *Burack v. United States,* 198 Ct.Cl. 855, 869–70, 461 F.2d 1282, 1291 (1972). Since, in order to find an individual liable for the penalty imposed by section 6672, he must have acted willfully, mere negligence in failing to ascertain the facts regarding a tax delinquency is insufficient to establish liability. *Bauer v. United States, supra,* 211 Ct.Cl. at 289, 543 F.2d at 150. However, willful conduct does include "a reckless disregard for obvious or known risks." *Bolding v. United States, supra,* 215 Ct.Cl. at 163, 565 F.2d at 672.

■ Generally, whether or not a particular person willfully failed to carry out his responsibility of insuring that the corporation collected and paid over the taxes collected depends upon the facts and circumstances of each case. *Feist v. United States, supra,* 221 Ct.Cl. at 535, 607 F.2d at 957; *see also Barrett v. United States,* 217 Ct.Cl. 617, 624, 580 F.2d 449, 452 (1978); *Burack v. United States, supra,* 198 Ct.Cl. at 868, 461 F.2d at 1291. In no case, however, may the Government recover from all liable individuals more than an amount equal to the tax owed as a penalty.[4] *Gens v. United States,* 222 Ct.Cl. 407, 415, 615 F.2d 1335 (1980); *see also* IRS Policy Statement P–5–60, IR Manual, MT 1218–56 (Feb. 25, 1976), *reprinted in* [1983] 8 Stand. Fed.Tax Rep. (CCH) ¶ 5569.01 (the Govern-

ment is entitled, through an assertion of 100 percent penalty assessments, to only one satisfaction).

With these standards in mind, the Court may now examine the liability of each plaintiff involved herein.

### A. Liability of Dudley J. Godfrey

■ The importance of the role of plaintiff Dudley J. Godfrey, Jr., in the operation and management of Career Academy, Inc., can hardly be underestimated. Since being elected a director in 1970, and certainly by the time he was elected chairman of the board in June 1972, he had become the single most important individual directing the business affairs of the corporation. He was the one individual at the corporation who provided continuity at the highest levels of authority during the last tumultuous five years of Career's existence. He was the one individual at the corporation to whom everyone looked for the ultimate financial, personnel and other management decisions. The banks looked to him, the corporate officers and emloyees looked to him, and the other directors of the corporation looked to him for the ultimate operation and management decisions. He was the one who took the lead in staving off the banks from foreclosing on defaulted loans. He was the one who took the lead in negotiating the new loans and recapitalization efforts. He was the one who took the lead in negotiating sales of subsidiary schools. He was the one who had the ultimate say on who was hired or fired. He was also the one (along with Mr. Ferrare and Mr. Metzdorff) who knew as early as October 1973 that the corporation was running behind on the payment of its tax obligations to the IRS. In short, the Court finds him to be one of the responsible officials with ultimate authority to order the payment of the delinquent corporate withholding taxes. The Court also finds him to have willfully preferred other creditors over the Federal Government.

---

4. In this case, the Government is limited to the recovery allowed by virtue of Part II of this

Opinion from all individuals found to be liable, under section 6672, for payment of the penalty.

As early as 1971, after being elected a director in 1970, Mr. Godfrey had assumed a prime management role in the financial affairs of the corporation. An example of his prominent role in matters financial can be seen in his successful negotiations with the Marshal and Islay Bank of Milwaukee, Wisconsin, to allow Career the right to borrow up to $3,900,000 as operating funds. The loan agreement provided that the loans would be due and payable on demand if neither Mr. Godfrey nor Mr. Gerald Kahn continued to serve as either chairman of the company's executive committee or secretary of the company. As of January 31, 1974, the principal balance owed by Career under this loan agreement was approximately $3,225,000. Career was in default of the agreement, and in both 1973 and 1974, Mr. Godfrey was negotiating with the bank for reinstatement based on Career's recapitalization agreements with AMS. Further, Mr. Godfrey was the prime management official who negotiated with all the other banks (Chemical Bank and U.S. Trust Company) and with AMS to stay afloat financially. These are all but examples of Mr. Godfrey's intimate involvement with the financial matters of the corporation. Clearly, he had the lead financial role at Career during all pertinent times.

Plaintiff Godfrey contends in this connection that he was not a responsible officer because he never signed any checks for the corporation, did not have authority to sign checks for the corporation and did not have authority to prepare or file, nor did he prepare or file, the various tax returns and forms for the corporation. This contention, however, is unavailing. The Courts have repeatedly found that not having these mechanical duties do not, in and of themselves, preclude a finding that the officer involved was nevertheless a responsible person. The critical test is still whether the person had the ultimate authority to order the taxes paid. Whether the person is in such a dominant position within the corporation that he had the power and authority to order other persons to pay the taxes is and remains the test! This Court finds that Mr. Godfrey was such a dominant person within

the corporation and could have ordered the taxes paid. *See Feist v. United States, supra,* 221 Ct.Cl. at 539, 607 F.2d at 960. The evidence is clear that the banks, other creditors, potential investors and essential corporate officers looked to Mr. Godfrey for ultimate decisions.

It likewise does not make any difference, as plaintiff Godfrey contends, that Mr. Ferrare, as president during the last critical year, was the prime person responsible for the nonpayment of taxes. It is quite true that Mr. Ferrare was a responsible person within the dictates of section 6672, and it has been so determined judicially. However, more than one person can be found to be a responsible party. *See White v. United States, supra,* 178 Ct.Cl. at 771, 372 F.2d at 516. Concededly, Mr. Ferrare was a prime responsible party, since he was president and exercised considerable control over which bills were to be paid and which bills were to be deferred. However, Mr. Ferrare did not act in a vacuum, nor did he try to conceal the financial distress of the corporation from anyone. He gave reports to the board of directors at every board meeting and discussed the situation between meetings whenever asked. The fact that Mr. Ferrare may have had the prime responsibility for the payment of the taxes in no way means that another officer with equal responsibility and power cannot be held to be a responsible person.

It should also be noted in this connection that plaintiff Godfrey was the main person responsible at the corporation for the hiring and firing of all corporate officers. Mr. Godfrey personally selected all of the last three presidents at Career, *i.e.,* Mr. Houghton in 1972, Mr. Maher in 1973 and Mr. Ferrare in 1974. Clearly, Mr. Godfrey had considerable power, authority and influence over their actions.

For all of the above reasons, the Court concludes that Mr. Godfrey was a responsible person within the contemplation of section 6672.

In addition, Mr. Godfrey was a responsible officer who willfully preferred other creditors over the Federal Government.

The evidence in this case indicates very clearly that Mr. Godfrey was aware of the fact that withholding taxes were not being paid, and that he simply did nothing to rectify the situation. As early as October 1973, in a meeting Mr. Godfrey attended, Mr. Metzdorff had threatened to resign over the nonpayment of taxes. While Mr. Metzdorff did not resign at that time, he was given a letter absolving him of responsibility for the nonpayment of the taxes. Mr. Godfrey also acknowledged receiving the monthly financial reports in October-December 1973 which clearly showed withholding taxes being accrued but not paid. Then in June 1974, Mr. Godfrey signed a general representation audit letter to the Arthur Anderson Company that acknowledged that the corporation's unpaid withholding tax liability approximated $250,000 as of May 31, 1974. Also, when the Arthur Anderson firm did issue their audit on July 11, 1974, it clearly highlighted the fact that Career was in arrears on its withholding taxes and that certain monetary penalties could be levied. Finally, it is clear that Mr. Godfrey was kept apprised of the financial condition of the corporation at the bimonthly board meetings, and many times between such board meetings.

The evidence is simply overwhelming that Mr. Godfrey knew for many months about Career's withholding delinquencies and did not do anything to rectify the problem. There clearly was money coming in from student enrollments and Government grants during this period of time, and it is equally clear that payroll, rents, utilities and other essential creditors were being paid, and thus preferred over the Federal Government. Career, in short, was being operated for over a year, at least partially, on withholding tax trust funds owed to the Federal Government. Mr. Godfrey was aware of all of this and thus must be held to have voluntarily, consciously and intentionally failed to collect and pay over the taxes by condoning such activity. In *Mazo v. United States,* 591 F.2d 1151 (5th Cir.), *cert. denied sub nom.* 444 U.S. 842, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979), the Fifth Circuit court held that:

The willfulness requirement is satisfied if the responsible person acts with a reckless disregard of a known or obvious risk that trust funds may not be remitted to the Government, * * * such as by failing to investigate or to correct mismanagement after being notified that withholding taxes have not been duly remitted.

*Id.* at 1154; *see also Kalb v. United States,* 505 F.2d 506, 511 (2d Cir.1974), *cert. denied,* 421 U.S. 979, 95 S.Ct. 1981, 44 L.Ed.2d 471 (1975); *United States v. Leuschner,* 336 F.2d 246, 248 (9th Cir.1964); *Bolding v. United States, supra,* 215 Ct.Cl. at 163, 565 F.2d at 672. Mr. Godfrey's influence within the corporation during the last critical year of its existence was such that had he ordered the taxes to be paid, they would have been paid.

In view of the above, this Court concludes that Mr. Godfrey was a responsible person within the scope of section 6672 and that he willfully chose to prefer other creditors over the withholding tax claims of the Government. Therefore, Dudley J. Godfrey, Jr., is not entitled to recover on its counterclaim against Dudley J. Godfrey, Jr.

### B. *Liability of Gerald J. Kahn and Gilbert Palay*

Although plaintiffs, Gerald J. Kahn and Gilbert Palay, were members of the Career board of directors, just as plaintiff Dudley J. Godfrey was, the evidence and testimony presented in this case indicate that they performed only those functions normally associated with individuals whose sole corporate function is to serve as members of a board of directors. Unlike plaintiff Godfrey, neither Mr. Kahn nor Mr. Palay were intimately involved with any negotiations concerning Career's deteriorating financial condition. In fact, other than certain routine legal and accounting matters handled by Mr. Kahn's law firm or Mr. Palay's accounting firm, neither of these plaintiffs appears to have been very active in the operation and management of Career outside of the boardroom.

Although Mr. Kahn was initially more active in the affairs of the corporation than

Mr. Godfrey, it is clear that once Mr. Godfrey took over the reins as chairman of the board in 1972 and became the dominant force in the corporation, Mr. Kahn retired to the background. Prior to 1971, Mr. Kahn had been the corporation's prime attorney, but after that date, Mr. Andrew Lauritzen took over that role. There is simply no significant evidence, documentary or otherwise, that links Mr. Kahn to a dominant role in the management or operation of the corporation during the critical last few years of its existence. Nor is there significant evidence, documentary or otherwise [5] that would show Mr. Kahn's knowledge of the corporation's tax delinquencies until the fateful November 19, 1974 board meeting. Mr. Kahn simply was not the dominant force in the corporation that people looked to for policy and direction. Thus, Mr. Kahn cannot be considered a responsible person under a duty to collect and pay over taxes as contemplated by section 6672 of the Internal Revenue Code.

Likewise, Mr. Palay had an insignificant role in the management and operation of Career during the last critical years of the corporation's existence. Prior to 1971, Mr. Palay had performed various consulting and auditing services for Career in his capacity as a certified public accountant with his accounting firm. However, by the end of 1971, Career owed Mr. Palay some $18,310 for unpaid professional services, which fees were ultimately declared as bad debts in 1972. From this point on, Mr. Palay lost considerable interest in the affairs of the corporation and performed no further professional services for it. He limited his involvement with Career to board meetings when called. Mr. Palay was not a dominant force in the corporation who people looked to for policy and direction. Thus, Mr. Palay, like Mr. Kahn, cannot be considered a responsible person under a duty to collect

and pay over taxes as contemplated by section 6672 of the Code.

■ Since the Court finds that neither Mr. Kahn nor Mr. Palay are responsible officers under a duty to collect the taxes, that should end the matter as to them. The Government argues, however, that they are responsible persons because they, together with Mr. Ferrare and Mr. Godfrey, formed the entire board of directors and thus all were ultimately responsible for the affairs of the corporation. Mr. Palay's and Mr. Kahn's responsibility was a collective responsibility. Since all four of the directors made the decision to keep the corporation running some three weeks after the November 19, 1974 board meeting in which the withholding tax delinquencies were clearly brought to light, they all have to be considered responsible officers that willfully preferred other creditors.

The Government's theory of liability in regard to Mr. Kahn and Mr. Palay is clearly misplaced and is contrary to established case law. It is contrary to the personal fault doctrine as enunciated by the Supreme Court in *Slodov v. United States,* 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978), and contrary to established case law in our predecessor court. In *Feist v. United States, supra,* 221 Ct.Cl. at 539, 607 F.2d at 960, the Court of Claims directed the search for "[a]ny corporate officer or employee with the power and authority to 'avoid the default' or to direct the payment of the taxes * * *." This was to be a search directed at a dominant corporate officer or employee with personal fault—not at a corporate board of directors with collective and indirectly ultimate responsibilities.

At the very most, Mr. Kahn and Mr. Palay may have been negligent in the performance of their director's duties. Negli-

---

**5.** Although Mr. Kahn presumably received several of Career's monthly financial reports in late 1973, and the July audit report authored by Arthur Anderson & Company, which showed withholding tax delinquencies, the financial efforts being made by Mr. Godfrey and the other executive officers during this time frame could well have caused Mr. Kahn to believe them not

to be serious matters. In any event, not to have taken any individual or collective action on these reports within the facts of this case would have amounted to negligence. Mere negligence is insufficient to establish liability. *Bauer v. United States, supra,* 211 Ct.Cl. at 289, 543 F.2d at 150.

gence, however, is not sufficient to establish liability for a section 6672 penalty. *Bauer v. United States, supra,* 211 Ct.Cl. at 289, 543 F.2d at 150. This Court is simply not convinced that either Mr. Kahn or Mr. Palay should be considered a responsible or key officer who had the ultimate authority to see that the taxes were paid.

Therefore, Gerald J. Kahn and Gilbert Palay are entitled to recover on their claims for refund of taxes paid in partial satisfaction of the assessed penalty, and the Government is not entitled to recover on its counterclaim against either Gerald J. Kahn or Gilbert Palay.

## II. The Maximum Amount of Penalty Which Can be Collected

While the parties have stipulated that the maximum amount which can be assessed against any of the plaintiffs under section 6672 is $191,734.68, both parties raise the issue of whether the maximum penalty should be offset by approximately $32,213. This approximate figure represents payments by Career to the IRS for payroll tax liabilities from bank accounts in which Career had deposited funds received from the Government for its college work-study program, which the plaintiffs allege were misapplied by the Government in contravention of the Government's own regulations.[6]

Career was a participant in the college work-study program under the Economic Opportunity Act of 1964, 42 U.S.C. § 2751, *et seq.,* which provided financial assistance to students through the provision of work opportunities. Under the law, the work was to be "in the public interest for a public or private non-profit organization." The program provided for agreements between the Department of Health, Education and Welfare (DHEW) and the educational institution under which the Federal Government would advance grant money to finance the program. All grants were subject to a vari-

ety of restrictions, including a requirement that all federal work-study funds "may be used only to make payments to students." 42 U.S.C. § 2754(a)(2) (1976); 45 C.F.R. § 175.7(a) (1974). No portion of the federal grant money could be used to satisfy any of the employer's own employment tax liabilities, *i.e.,* social security, workmen's compensation, retirement, etc.

Under the work-study program, the vocational institution would enter into a contract with DHEW (now presumably the Department of Education) for whom the services would be performed, with either the institution or the agency handling the necessary payroll functions. In the instant case, Career elected to handle the payroll, although the actual payroll procedures required various certifications and other participation by DHEW.

During the third quarter of 1974, Career paid a total of $25,132.79 to the Internal Revenue Service from bank accounts in which Career had deposited funds received from the Government for the college work-study program. Of the $25,132.79 paid, $8,192.80 was paid by Career to the IRS on August 23, 1974, specifically to satisfy Career's federal payroll tax liability already in arrears for the first quarter of 1974. The balance, $16,939.99, was paid as routine federal tax deposits with no particular application of the payments requested by Career. The IRS applied the $16,939.99 to Career's employer liability for FICA taxes for the third quarter. Therefore, no portion of the $16,939.99 was applied to Career's liability for the employee's income and FICA withholding taxes to which the 100 percent penalty at issue here attaches. The portion of Career's reported income and FICA tax withholding liability for the third quarter of 1974, for students (employees) in its federal college work-study program, was $25,093.14. College work-study student funds

---

6. The parties have failed to stipulate to the exact amount of federal work-study funds, paid by Career in the form of routine voluntary tax payments, which were applied by the IRS in satisfaction of Career's employer liability for social security (FICA) taxes. However, the plaintiff has alleged that the correct amount is $32,213.42, and the Government appears to have accepted this figure within the context of its post-trial brief. This figure allegedly represents the Government's misapplication of $16,939.99 in the third quarter of 1974, and of $15,273.43 in the fourth quarter of 1974.

were not specifically identified in any way on Career's Form 941 tax return for the third quarter of 1974.

During the fourth quarter of 1974 (ending December 11, 1974), Career paid $21,921.73 to the IRS from bank accounts in which Career had deposited funds received from the Government for the college work-study program. The $21,921.73 was paid as routine tax deposits with no particular application of the payments requested by Career. The IRS applied $15,273.43 of the $21,921.21 to Career's employer liability for FICA taxes for the fourth quarter. Together with payments made by Career from other accounts, this was sufficient to fully pay Career's employer FICA tax liability for the fourth quarter. The IRS applied the remaining $6,648.30 balance to Career's fourth quarter 1974 liability for Career's employees' income and FICA withholding (*i.e.*, trust funds). The portion of Career's reported income and FICA tax withholding liability for the fourth quarter of 1974 for students in its federal college work-study program was $21,931.82. College work-study student funds again were not specifically identified in any way on Career's Form 941 tax return for the fourth quarter of 1974.

Under 45 C.F.R. § 175.8(b) (1974), the Government regulations for administering the work-study program provide that:

> The Federal share of compensation for such employment * * * shall not include * * * any costs of the employer's contribution to Social Security, workmen's compensation, retirement, or any other welfare or insurance programs which may be paid by the employer on account of a student employed under the Work-Study Program.

Notwithstanding this regulation, the Government has argued that absent any agreement, direction or request by the taxpayer, the IRS has the right to apply voluntary tax payments made by Career in whatever manner it sees fit. However, this Court is unwilling to adopt that position.

This Court does recognize that as a general rule:

> [I]f an individual who owes two debts to the same creditor makes a payment to that creditor, he has a right to designate the debt to which the payment shall be applied if he manifests his desire before or at the time of payment. However, if the debtor does not indicate his intention, the creditor may within a reasonable time designate how the payment will be applied.

*First Nat'l Bank in Palm Beach v. United States,* 591 F.2d 1143, 1147 (5th Cir.1979). The situation in the instant case, however, is distinguishable from the majority of cases where the general rule must be applied. Here, the Government is not seeking to recover delinquent taxes from the original taxpayer, Career, but, in the form of a section 6672 penalty, from the officers and directors of the original taxpayer. Further, while the Government can apply, absent a designation from the taxpayer, voluntary taxes paid in whatever manner it so chooses, it cannot apply those taxes in such a manner as to place the taxpayer in a position contrary to the Government's own rules and regulations. In effect, the regulations made the designation for Career that the IRS was duty bound to follow.

Here, Career was prohibited, by the Government's own regulations, from using any of the Governmental monies received under the federal college work-study program to satisfy Career's employer share of social security (FICA) taxes owed to the Government. The Government, in applying monies received by Career under the federal college work-study program to Career's own FICA tax obligations, even though Career failed to designate the monies as coming from such source, effectively placed Career involuntarily in violation of the Government's own regulations. This the Government cannot do. *See DeMatteo Construction Co. v. United States,* 220 Ct.Cl. 579, 593, 600 F.2d 1384, 1392 (1979).

Therefore, the maximum assessment under section 6672, which can be assessed and recovered by the Government, is $191,734.68, the amount stipulated by the parties

as the maximum tax penalty which could be assessed against any of the plaintiffs, less approximately $32,213, the exact amount, representing the amount of federal college work-study funds misapplied by the Government, is to be stipulated by the parties in accordance with this opinion.

### III. Attorney's Fees

While all of the plaintiffs herein have demanded attorneys fees in their individual complaints,[7] only plaintiffs Gerald J. Kahn and Gilbert Palay, as prevailing parties, would be entitled to "fees and other expenses," provided that this Court does not find "that the position of the United States was substantially justified or that special circumstances make an award unjust." Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A) (Supp. IV 1980). The test of whether the Government's position in the litigation was substantially justified is whether that position was reasonable in light of all the pertinent facts. *Gava v. United States,* 699 F.2d 1367, 1370 (Fed.Cir. 1983). In view of the difficult factual questions presented in this case and in view of the Court's finding of negligence on the part of both Mr. Palay and Mr. Kahn, it is difficult for this Court to find that the Government's litigating position was not substantially justified. Therefore, plaintiffs' demand for an award of attorney fees, at this juncture, must be denied. However, since plaintiffs Kahn and Palay have not had the opportunity to brief and argue their position to the Court, they may, if they so choose, pursuant to 28 U.S.C. § 2412, properly move this Court for an entry of an award of attorney's fees within 30 days of the entry of final judgment in this case, citing appropriate factual and legal support therefor.

### Conclusion

Accordingly, the Government's counterclaim against plaintiff, Dudley J. Godfrey, Jr., in Docket No. 365–77, is granted for an amount not to exceed $191,584.68 less an amount to be stipulated by the parties within 60 days, representing the amount of federal college work-study funds misapplied by the Government, or to be determined by the Court upon the parties giving notice, within 60 days, of the necessity for further proceedings in order to determine the maximum amount of the Government's recovery, and the complaint of Dudley J. Godfrey is to be dismissed at that time.

Accordingly, Gerald J. Kahn, in Docket No. 366–77, is entitled to recover from the Government the sum of One Hundred Fifty Dollars ($150.00), together with interest as provided by law, and the Government's counterclaim against Gerald J. Kahn is to be dismissed.

Accordingly, Gilbert Palay, in Docket No. 367–77, is entitled to recover from the Government the sum of One Hundred Fifty Dollars ($150.00), together with interest as provided by law, and the Government's counterclaim against Gilbert Palay is to be dismissed.

Accordingly, pursuant to Rule 54(b), of the Rules of this Court, there being no just reason for delay, final judgments shall be entered on the complaints of and counterclaims against Gerald J. Kahn and Gilbert Palay, Nos. 366–77 and 367–77, respectively, with further proceedings to be had as stated above on the complaint of and counterclaim against Dudley J. Godfrey in No. 365–77.

---

**7.** While the plaintiffs have demanded attorneys fees pursuant to 42 U.S.C. § 1988, this Court would note that the authority to obtain an award of attorneys fees under 42 U.S.C. § 1988 has been repealed by the Equal Access to Justice Act, 28 U.S.C. § 2412, Pub.L. 96–481, for "adversary adjudications and civil actions pending on, or commenced on or after October 1, 1981."