**Eldon E. BAUER**

v.

**The UNITED STATES.**

**No. 102–74.**

United States Court of Claims.

Oct. 20, 1976.

---

J. Kevin Mahoney, Rochester, N. Y., atty. of record, for plaintiff. Harris, Beach & Wilcox, Rochester, N. Y., of counsel.

Patricia B. Tucker, Washington, D. C., with whom was Asst. Atty. Gen. Scott P. Crampton, Washington, D. C., for defendant. Theodore D. Peyser and Robert S. Watkins, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and DAVIS and BENNETT, Judges.

## OPINION

PER CURIAM:

This case comes before the court on defendant's motion, filed July 22, 1976, pursuant to Rule 141(b), requesting that the court adopt, with a modification, the recommended decision of Trial Judge Louis Spector, filed June 16, 1976, pursuant to Rule 134(h), as the basis for its judgment in this case. Upon consideration thereof, without oral argument, it appears that plaintiff has filed no intention to except to the trial judge's recommended decision and that the time for so filing pursuant to the Rules of the court has expired. Since the court agrees with the trial judge's recommended decision (with the modification requested by defendant), as hereinafter set forth *, it hereby affirms and adopts the same as the basis for its judgment in this case. Therefore, it is concluded that plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c). Defendant's counterclaim is dismissed.

## OPINION OF TRIAL JUDGE

SPECTOR, Trial Judge: This is a tax refund suit to recover the sum of $421.35,

* Whereas the court adopts the trial judge's separate findings of fact which are set forth in his report filed June 16, 1976, they are not printed herein since such facts as are necessary to the decision are contained in his opinion.

plus interest, paid by plaintiff in partial satisfaction of a 100 percent penalty of $69,022.39 assessed by the Internal Revenue Service. The defendant has counterclaimed for the balance of the assessment, plus interest, and a lien ·fee.

Resolution of the case hinges upon application of the relevant facts, to the following pertinent provisions of the Internal Revenue Code of 1954:

## RULES FOR APPLICATION OF ASSESSABLE PENALTIES

(a) *Penalty Assessed as Tax.*—The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary or his delegate, and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to "tax" imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.

(b) *Person Defined.*—The term "person", as used in this subchapter, includes an officer or employee of a corporation, or a member or employee of a partnership, who as such officer, employee, or member *is under a duty to perform the act in respect of which the violation occurs.* [26 U.S.C. § 6671. Emphasis supplied.]

## FAILURE TO COLLECT AND PAY OVER TAX OR ATTEMPT TO EVADE OR DEFEAT TAX

Any person *required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof,* shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over. No penalty shall be imposed under section 6653 for any offense to which this section is applicable. [26 U.S.C. § 6672. Emphasis supplied.]

Plaintiff's former employer, Management and Technology, Inc. (hereinafter MATI), failed to pay over withholding taxes with respect to wages paid to employees of MATI during the last two calendar quarters of 1970. The 100 percent penalty has been levied by IRS against plaintiff individually on the grounds that he was a person, within the contemplation of the code above-quoted, under a *duty* to collect and pay over these withholding taxes, but that he *willfully* failed to do so. This case, therefore, has essentially two issues—was plaintiff's position with MATI during the pertinent period such that he had the *duty* to collect and pay over taxes within the meaning of the code; and, if such a duty is found to exist, was plaintiff's failure to discharge that duty *willful.*

■ MATI, as the employer, was required to withhold income and Federal Insurance Contributions Act taxes from the salaries of its employees. 26 U.S.C. §§ 3102(a), 3402(a). Taxes thus withheld by an employer are deemed to be held in trust for the United States, and must be paid over to IRS at the end of each calendar quarter. To insure collection and payment of these withholdings, the code imposes the above-described 100 percent penalty, equal to the amount of the taxes which are not so collected and paid over. The penalty is imposed on all responsible persons who, by virtue of their status within the employer-business, had fiscal control such as to invest them with the duty to collect and pay over withholding taxes. It is defendant's position that plaintiff was such a person.

On the same grounds, defendant is also seeking to collect the same 100 percent penalty (which it may collect, however, only once), from Richard C. Williams, then president of MATI, and from John Rodgers, then secretary-treasurer of MATI. Their litigation is currently pending in the U. S. District Court for the Western District of New York.

Plaintiff has had a long career in the photofinishing aspects of the photography business. In the early 1960's he became a

director of a company called A & R Color Labs, Inc. (hereinafter A & R). Thereafter, in approximately August 1968, plaintiff became president and a shareholder of A & R. A & R was in the business of developing film and making color print products for the professional photographic trade. Plaintiff's work experience for over 30 years prior to the period in question has been entirely of a technical, and not of a fiscal, nature. His training and experience have been directed primarily toward the production functions of photofinishing.

While president of A & R, his duties had similarly been of a technical nature, and he relied upon the treasurer and comptroller of A & R, one Donald Sand, to handle the financial and accounting affairs of the company, including preparation of financial statements, tax returns, and the filing and payment of taxes. In October 1968, plaintiff was asked to become a director of MATI. He was not duly elected a director. However, he served as a director, participated in most MATI board meetings, and erroneously believed that he had been properly elected to that office as of October 1968.

In 1968 MATI consisted of an optical division and a photographic bellows division, both the continuations of two separate businesses earlier acquired by MATI. Then in 1969, MATI acquired A & R in an exchange of stock, as the result of which plaintiff became the owner of over 200,000 shares of MATI, making him one of the company's five largest shareholders. Thereafter, plaintiff's former company, A & R, was operated as a subsidiary of MATI. The professional photofinishing business of A & R remained essentially the same after its acquisition by MATI, as it had been prior to that acquisition. Plaintiff retained his title as president of A & R. He also became manager of operations for the photofinishing division of MATI, which was comprised of A & R, and the two other similar businesses previously acquired by MATI.

As manager of operations for MATI's photofinishing division, plaintiff's duties remained as they had always been, technical in nature. He was in charge of production, quality control, and scheduling. All of the accounting and financial affairs of A & R, and of the two previously acquired businesses, were assumed and performed by MATI. The treasurer of A & R, Donald Sand, became treasurer of MATI following the acquisition, and he continued to be responsible for preparing and filing quarterly employment tax returns, and paying the withholding taxes. As treasurer, he reported directly to the president, Richard C. Williams.

Mr. Williams had become president of MATI in approximately 1967. He thereafter continued in that office through the last two quarters of 1970, the period in question. He was also chairman of the board. Williams had, before coming to MATI, been the treasurer and comptroller of another business where he was responsible for and was familiar with the preparation, signing and filing of corporate tax returns.

MATI was under-capitalized from its inception and Williams engaged in constant efforts to obtain additional operating capital. As early as February 1970, he was aware that MATI was not currently meeting its employee withholding tax obligations. The company was also plagued by substantial debts throughout its existence. This condition was common knowledge, and was known to plaintiff who, with other members of MATI management, had personally borrowed funds in 1968 totaling $100,000. The company did not meet the interest payments and, in May 1970, converted these loans, including plaintiff's, to MATI stock.

During the year 1970 the business affairs of MATI were conducted in a lax, informal manner, without the customary corporate formalities. There were no shareholder meetings during that year, and no written notice of a board of directors' meeting was issued by the secretary in 1970. No formal meetings of the board of directors took place after January 7, 1970. During the last two quarters of 1970 there were only two directors of MATI although the by-

laws required three. An executive committee of the board, formed in January 1970, was not duly constituted since it contained only two director-members, and the MATI by-laws required at least three. No formal financial reports were prepared for MATI directors on a regular or current basis during 1970, nor were they issued information concerning delinquent employee withholding taxes.

Although he had served without the requisite formalities as if he were a director of MATI since October 1968, plaintiff did not properly assume that office until January 1970 at the annual board meeting, by appointment of the board, as distinguished from election by the stockholders. Plaintiff was also made vice president at that meeting, and also appointed to the executive committee.

In June 1970, John Rodgers, earlier mentioned as a party with Williams in parallel litigation before the U. S. District Court, became secretary-treasurer of MATI upon the resignation of treasurer Donald Sand. He remained in that position during the period in question. Under the MATI by-laws, Rodgers, as treasurer, had responsibility for keeping financial records, disbursing funds and reporting on the financial condition of the corporation. He reported directly to the president, Williams, and was under his direct supervision. Rodgers was familiar with the procedure for purchasing depository receipts as a method of paying employee withholding taxes, and had the responsibility for preparing the tax returns, and seeing that they were properly signed and filed. The actual preparation of checks and the computation of payroll accounts for MATI was handled by subordinates under Rodgers' direction.

Employment and withholding taxes were not currently paid to IRS during any quarter of 1970. MATI's president, Williams, was aware of this delinquency early in 1970. Rodgers learned of it when he took office in June, and he went directly to Williams to discuss the matter. In an effort to resolve the problem of delinquent taxes, Williams, secretary-treasurer Rodgers, and the prior treasurer, Donald Sands, had a series of meetings with personnel from IRS. Plaintiff did not attend these meetings. As a result of the meetings, MATI made periodic lump-sum payments to IRS which were credited against delinquencies for the first and second calendar quarters of 1970. No written agreement was entered into with the representatives of IRS.

It was Williams' understanding that MATI would not be shut down by IRS if the agreed amounts were paid. Williams understood that MATI was not relieved of its liability for the delinquent or current taxes, by virtue of the periodic payments. Neither Williams nor Rodgers were told by IRS that MATI did not have to make current payments, while making up payments on the delinquent taxes for prior quarters. Plaintiff knew of the meetings with IRS but was not aware of the specific nature of the tax problem, nor of the specific results of the meetings.

Rodgers first informed plaintiff of the specific tax problem, the employee withholding tax delinquencies, in December 1970, which is at the end of the period in question here. Prior to that time, as early as spring 1970, plaintiff was aware of an outstanding tax liability but was not aware of the specific details of that liability nor of the specific details of the oral understanding that had been reached with IRS by Williams and Rodgers. Plaintiff was not told until December 1970, the end of the period in question, of the arrangement with the Internal Revenue Service, and he thereafter assumed Rodgers and Williams were carrying out the payment arrangements they had agreed upon with respect to these delinquencies.

Both the regular and executive payrolls of MATI during the period in question were prepared under the direction and supervision of Rodgers who received all information on employee deductions, including withholding taxes. When sufficient funds were available, Rodgers would prepare a corporate check to cover employee withholding taxes and other employee deductions. Frequently there would be insuffi-

cient funds to cover all employee deductions and withholding taxes, and Rodgers would then direct that funds be disbursed to other employee deductions while employee withholding taxes remained unpaid. In doing so, Rodgers was aware that current payments of employee withholding taxes were not being made during the period in question. Plaintiff was not involved in the preparation or payment of employee payroll, or employee withholding taxes, or other employee deductions. Plaintiff never prepared, signed nor filed any tax returns of MATI, nor did he ever participate in the preparation of a MATI financial statement.

As president of MATI, Williams was principally active in dealing with the demands of creditors. Most of his time was spent in trying to raise additional funds. He met with the creditors to discuss their accounts and make payment arrangements. He obtained loans for MATI during 1970 and personally granted rights to MATI stock. His acts were accomplished without formal board action. Plaintiff was generally aware of the deteriorating condition of the company, and of Williams' activities to remedy the situation. But plaintiff was consulted only when supplies for his photofinishing division were involved.

Rodgers directed and supervised a clerk in connection with the payment and accounting of MATI's accounts payable. Rodgers would direct which creditors of MATI should be paid, and the amount of such payment, from a list of vendor invoices prepared by the clerk, and from a list of critical creditors which Rodgers prepared personally. The decision on whom to pay was reached by Rodgers and Williams and, only to the extent that supplies for his photofinishing division were involved, was plaintiff consulted. The clerk in charge of the payment and accounting of MATI never received instructions or directions for the payment of creditors from anyone in MATI other than Rodgers. As previously observed, plaintiff was aware of the seriousness of MATI's finances throughout 1970, because the photofinishing division was not receiving the materials it required in order to continue at full production and, furthermore, it was common knowledge that MATI had run out of current operating funds. Plaintiff knew that some suppliers had put MATI on a cash basis.

Plaintiff did not order supplies directly from vendors. Rather his subordinates in the photofinishing division submitted purchase order requests directly to Rodgers and not to plaintiff. Plaintiff did not even have any direct contact with the major supplier of the photofinishing division, the Eastman Kodak Company. When problems arose with the MATI account, representatives from Kodak met or spoke with Rodgers and, on occasion, with the president, Williams. It was Rodgers who generally handled creditor calls. These calls would be discussed with Williams but plaintiff would be consulted only to the extent the call related to the supplies of the photofinishing division, or if his technical expertise in the photofinishing area was required. Plaintiff was not asked, and did not make decisions with respect to the payment of creditors, including Kodak, but rather was asked his opinion on how much and which of the supplies that had been ordered from a creditor were absolutely necessary to continue production in the photofinishing division. Rodgers then made decisions with respect to the ordering of supplies and materials based on the availability of funds.

All of the negotiations for preserving MATI's line of credit with Kodak were conducted by Rodgers and not by plaintiff. Kodak representatives did not look to plaintiff but rather to Rodgers or Williams with respect to financial problems or credit arrangements.

Plaintiff and one William Spencer, the manager of the Spencer Photo business earlier acquired by MATI, were frequently advised during the period in question by Williams and Rodgers that there were insufficient funds to obtain all requested supplies and materials. On one occasion plaintiff advised Spencer, when the latter was having trouble getting supplies that plaintiff had nothing to do with the financial aspects of the company and that Spencer would

have to go through Williams, which he then proceeded to do.

During the period in question plaintiff did not receive any written information which made reference to the overall financial condition of MATI or to its delinquency in employee withholding taxes although these problems were generally known throughout the company. Plaintiff did not have control, custody, or possession of the books, records, or checkbooks of MATI. Although plaintiff, Williams, and Rodgers were each authorized by the board (by an act which, characteristically, did not conform to the provisions of the bylaws) to deposit and withdraw funds and incur liabilities on behalf of the corporation, as well as to conduct all other banking transactions as might be necessary in carrying out their duties and, while they signed signature cards relating to two MATI accounts including one entitled "Payroll Account," plaintiff never actually signed a corporate check of MATI, nor was he ever involved in any of its banking transactions.

In January 1971, MATI went into bankruptcy, still having failed to pay over the taxes which it collected from its employees for the last two quarters of 1970. Thereafter, plaintiff was assessed the penalty which is the subject of this litigation, and of parallel litigation involving Williams and Rodgers in the U. S. District Court. Following bankruptcy, plaintiff purchased the assets of A & R and continues to operate that business today.

The foregoing facts are essentially undisputed. Where the parties would in certain minor respects suggest a different emphasis or inference, their differences have been weighed, and also measured against the testimony of disinterested witnesses not directly involved in this litigation nor in the parallel suit in the U. S. District Court.

■ It is concluded on the basis of these facts that plaintiff was not a person under a duty to collect, account for, and pay over withholding taxes with respect to wages paid to employees of MATI; nor, therefore, was he a person who willfully failed to discharge such a duty, nor a person who willfully attempted to evade or defeat such taxes or the payment thereof, within the contemplation of the cited code provisions.

This type of case is especially dependent upon its facts. Prior decisions are principally useful for comparison on their facts and to illustrate the type of facts which are ordinarily highlighted and emphasized. In *White v. United States*, for example, it was observed that:

Since the courts are looking for the person who could have seen to it that the taxes were paid, sometimes they just speak more generally about general policy-making authority or *fiscal* control, instead of pointing more explicitly to authority to direct payment of creditors. Thus, in *United States v. Strebler*, 313 F.2d 402 (8th Cir. 1963), the court decided that the corporation's president was the person responsible for collecting and paying over taxes withheld because he had the authority to act, and did act, as *fiscal* manager of that company's affairs, and exercised authority over the general policy, affairs, and *finances* of the corporation.

Both approaches would seem to amount to the same thing—*a search for a person with ultimate authority over expenditures of funds* since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes. In *Bloom v. United States, supra,* 272 F.2d 215, the court tied the two together in holding the president of the corporation involved there to be the responsible person, since he was in charge of the entire operation, made the final decisions, and decided what creditors were, or were not, to be paid. [Emphasis supplied.[1]]

■ Plaintiff does not fit these definitions. He was at best only a nominal figure

1. 372 F.2d 513, 517, 178 Ct.Cl. 765, 772 (1967).

"* * * For this reason, as the Government points out in its brief, a responsible person is most frequently defined as a person who has 'the final word *as to what bills or creditors should or should not be paid* and when.' " [Citing cases. Emphasis supplied. 178 Ct.Cl. at 771, 372 F.2d at 516.]

of authority in the fiscal area. Mere office holding of and by itself does not render one responsible for the collection and paying over of employee withholding taxes.[2]

In each case in this court in which a person was found to possess the requisite "duty" under section 6672 of the code, it has been established by the evidence that he actually signed or cosigned corporate checks.[3] Aside from the fact that this plaintiff's "authority" to sign checks was not in accordance with the company's by-laws, the evidence establishes that he never had custody of nor control over the corporate checkbook, and never in fact signed a corporate check.

Another important factor is to determine who was responsible for preparation and payment of the payroll.[4] This function was performed only by Rodgers, or by persons under his supervision. The payroll clerk specifically testified that when there were insufficient funds to pay employee withholding taxes and other debts, she would on occasion be directed by Rodgers to apply the withholding taxes to other debts. Plaintiff had nothing to do with payroll. He was not authorized in the by-laws or in actual practice to act in that area.

Rodgers, furthermore, signed and filed quarterly employment tax returns, and reported directly to Williams on such matters. As a former treasurer and comptroller, Williams was also conversant with fiscal affairs, in contrast with plaintiff whose experience, skills and duties were and always had been technical in nature. The meetings with IRS representatives were with Williams and Rodgers, not with plaintiff, and he was dependent on the president and treasurer for information about, and the resolution of those tax problems.

Nor did plaintiff have "the final word as to what bills or creditors should or should not be paid and when."[5] All bills were paid by a clerk under Rodgers' supervision, and it was he who directed the priorities when funds became insufficient. Nowhere in the record is it suggested that Williams or Rodgers asked plaintiff whether the bills of specific suppliers should or should not be paid, and plaintiff did not have that ultimate decision-making authority. He would be consulted if supplies for his division were involved, in the hope that he could settle for less and still maintain production. Significantly the largest supplier, Kodak, sought out Williams and Rodgers, not plaintiff, when they had a problem.

In short, plaintiff was an outsider with respect to the financial and fiscal affairs of the company. He did not meet with representatives of the bank which was principally concerned with MATI's financial condition and, without plaintiff's approval, Williams sold major corporate assets and obtained a loan by granting rights to acquire MATI stock.

The courts recognize the normal division of and limitations on authority exercised by various representatives of a particular business, as illustrated in *Bernardi v. United States*.[6] There the 100 percent penalty was asserted against three persons but one of these (Lutz) whose authority in fiscal affairs, incidentally, was greater than that of plaintiff's in this case, was held not responsible. He was a vice president, director, and shareholder of a corporation, and in charge of operations. He had no responsibility for payroll nor in determining credi-

2. *Monday v. United States*, 421 F.2d 1210, 1214 (7th Cir. 1970), *cert. denied*, 400 U.S. 821, 91 S.Ct. 38, 27 L.Ed.2d 48 (1970).

3. *See & cf. White*, note 1 *supra; Burack v. United States*, 461 F.2d 1282, 198 Ct.Cl. 855 (1972); and *McCarty v. United States*, 437 F.2d 961, 194 Ct.Cl. 42 (1971).

4. *See & cf. Ponkey v. Campbell*, 62–1 U.S.T.C. ¶ 9242 (N.D.Texas 1961), in which it was highlighted as the most important factor, in the instructions to the jury.

5. *See* note 1 *supra*. In *White*, the plaintiff signed all corporate checks, supervised the bookkeeping, directed the preparation of payroll and paid employees.

6. 74–1 U.S.T.C. ¶ 9170 (N.D.Ill.1973), *aff'd* 507 F.2d 682 (7th Cir. 1974), *cert. denied*, 422 U.S. 1042, 95 S.Ct. 2656, 45 L.Ed.2d 693 (1975).

tor priorities. He had nothing to do with keeping tax records or making out tax returns. Lutz was, however, authorized to sign corporate checks, and did so. He actually signed the employer's quarterly tax returns for the quarters at issue, had intimate knowledge of the corporation's financial problems and met with the accounts receivable factor to discuss credit arrangements.

In *Bernardi*, the court held that Bernardi, the treasurer, and one Richter, the chairman of the board, had the requisite duty to pay the taxes, but not Lutz. As to the latter, the court observed:

> * * * If Lutz had decided that withheld taxes should be segregated or paid over to the Government immediately, he could have implemented that decision only by persuading Bernardi or Richter, or both, to segregate funds or to pay the taxes.[7]

That observation would be even more appropriate in this case where plaintiff had comparatively less knowledge and actual authority in the financial and tax affairs of MATI.[8]

■ It should perhaps be further noted that even if it were assumed, *arguendo*, that plaintiff in this case had the requisite "duty" within the contemplation of the code, his failure to discharge that duty must also have been "willful," if he is to be held liable for the penalty. It has been held that "[f]or the purposes of the statute, the individual must be responsible and his failure

willful. Responsibility without willfulness is not enough." [9] The facts fall far short of demonstrating the requisite "willfulness" on plaintiff's part even if it were found (which it is not) that he was chargeable with the requisite "duty." Mere negligence in failing to ascertain facts regarding a tax delinquency is insufficient to constitute willfulness under the code.[10]

On the basis of the evidence, it is concluded that judgment should be entered for plaintiff, and that defendant's counterclaim should be dismissed.

## CONCLUSION OF LAW

Upon the trial judge's findings and opinion, which are adopted by the court, the court concludes as a matter of law that plaintiff is entitled to recover and judgment is entered to that effect with the amount of recovery reserved for further proceedings under Rule 131(c). Defendant's counterclaim is dismissed.

---

7. Note 6 *supra*, 74–1 U.S.T.C. ¶ 9170 at 83,215.

8. *In accord, Campbell v. Nixon*, 207 F.Supp. 826 (E.D.Mich.1962); *Gurvey v. United States*, 66–1 U.S.T.C. ¶ 9142 (N.D.Ill.1965); *Lauinger v. Scanlan*, 65–1 U.S.T.C. ¶ 9336 (E.D.N.Y. 1965); *Mattox v. United States*, 59–1 U.S.T.C. ¶ 9286 (D.C.Minn.1959); *Sperry v. Tomlinson*, 58–2 U.S.T.C. ¶ 9549 (S.D.Fla.1958). *Contrast Scott v. United States*, 354 F.2d 292, 173 Ct.Cl. 650 (1965), and the cases cited in note 3 *supra*, in all of which the persons held responsible were directly experienced and intensively engaged in the fiscal and tax affairs of their respective companies.

9. *McCarty*, note 3 *supra*, 437 F.2d at 967, 194 Ct.Cl. at 53–54. Willfulness has been defined

in *White*, notes 1 and 3 *supra*, as "a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the government." [372 F.2d at 521, 178 Ct.Cl. at 778.]

In *Monday*, note 2 *supra*, it is similarly defined as follows:

"An act is willful if it is voluntary, conscious and intentional. If you find that plaintiff * * knowingly used available funds to prefer other creditors over the United States, then you must find that he acted willfully." [421 F.2d at 1216.]

10. *Levy v. United States*, 140 F.Supp. 834 (W.D.La.1956).