Michael N. STEWART, Plaintiff,

v.

The UNITED STATES, Defendant.

No. 360–87T.

United States Claims Court.

May 25, 1989.

Edited by the Court and Filed
Dec. 20, 1989.

Harold C. Arcaro, Jr., Providence, R.I.,
for plaintiff.

Alexandra E. Nicholaides, Washington,
D.C., with whom was Acting Asst. Atty.
Gen. James I.K. Knapp, for defendant.

MEMORANDUM OPINION

MOODY R. TIDWELL, III, Judge:

[This opinion was originally issued
from the bench on May 25, 1989, by the
court sitting in Attleboro, Massachusetts.
In this written opinion the court deleted
several administrative matters that were
not germane to the opinion. The opinion

itself is as given to the parties on May 25, 1989 with *de minimis* editorial corrections. The substance of the opinion, including the factual statement, findings and conclusion are unchanged and presented here in their entirety. The court believes this to be a case of first impression in the federal courts and for that reason decided that it should be published. The opinion was, and remains, final as of May 25, 1989.]

Plaintiff brought suit in this court to recover part of a token tax penalty that he had paid in response to an assessment of the Internal Revenue Service based upon the determination that he was one of two persons responsible for the collection of federal income and Social Security payments from employees of his professional medical service corporation, Reservoir Avenue Emergency Room. Defendent counterclaimed for the remaining amount due under the assessment.

## FACTS

The relevant history of this case began in 1979 with plaintiff, Dr. Michael Stewart, an emergency medical specialist working as an independent contractor on an hourly basis for the Warwick Emergency Room. While at Warwick, Dr. Stewart met Ms. Sheila Linstrom, the office manager and assistant administrator at Warwick. In that capacity, Ms. Linstrom was responsible for, among other things, Blue Cross, Medicare, and welfare insurance submissions and collection, patient admission, discharge, record keeping and related matters. During Dr. Stewart's tenure at Warwick, he earned an excellent reputation as an emergency treatment specialist. Likewise, Ms. Linstrom had gained a reputation as a capable administrator, both as a supervisor and in the handling of paperwork. She had, in fact, doubled Warwick's income from Blue Cross through the efficient management of document preparation and claim collection. The owner of Warwick was so impressed with Ms. Linstrom's skills that he requested her to establish another emergency clinic for him.

In 1980, while working at Warwick, Dr. Stewart made a decision to establish his own emergency medical practice. Dr. Stewart had no doubt that he could handle the medical aspects of the emergency clinic but lacked the business and administrative acumen to support such an enterprise. In fact, from the outset, Dr. Stewart did not even want to become involved in the business aspects of his emergency clinic. With that in mind, he sounded out Ms. Linstrom to ascertain whether she would be interested in leaving Warwick to help him open his new facility. The more Dr. Stewart spoke with Ms. Linstrom, the more interested she became until she agreed to come with him. After several discussions, an agreement was reached between the two of them as to how the center would run. Ms. Linstrom agreed to work for Dr. Stewart as a business administrator of the clinic with the caveat that she would have complete control over all business matters. This agreement was never reduced to writing but the understanding was clear.

Dr. Stewart and Ms. Linstrom solicited both medical and business support from other Warwick employees and at least several agreed to come with them on the new venture. At about this point in time, Dr. Stewart approached Mr. Adrian Hebert, a Certified Public Accountant who had prepared Dr. Stewart's tax returns for the previous two years, for advice. Mr. Hebert soon became the financial and tax advisor to the new emergency medical clinic. After discussions with Dr. Stewart and Ms. Linstrom, Mr. Hebert prepared loan, lease, SBA guaranty agreements and various tax documents. Mr. Hebert or someone from his firm also explained the tax aspects of the business to Ms. Linstrom, set up the tax ledgers and taught her basic accounting procedures. Shortly thereafter, Dr. Stewart formally incorporated the clinic as the Reservoir Avenue Emergency Medical Room, Inc. The corporation was initially established in the general corporate form, but very shortly thereafter was reincorporated as a professional service corporation under the laws of the State of Rhode Island.

The corporate law of Rhode Island as revised in 1985 permitted the creation of professional service corporations to aid the authority of the Supreme Court to regulate the admission of attorneys, but was worded so as to explicitly include physicians and fifteen other professions. The law provided that every officer, director and shareholder of the corporation under that section must be an individual authorized to practice such profession and be employed by the corporation in such practice. R.I.Gen. Laws, Ch. 5.1, § 7–5.1–3 (1985). The law provided further that, "Every corporation organized under this chapter may render its professional services only through employees who are authorized to practice provided, however, that nothing herein shall be interpreted to prohibit any such corporation from employing unlicensed persons to perform functions not constituting such professional services." *Id.* at § 7–5.1–6. In the form of a closely held professional service corporation, Dr. Stewart was the sole shareholder, director, president, secretary and treasurer of the Reservoir Road Emergency Room. Other doctors were employed as independent contractors on an hourly basis, as had Dr. Stewart been employed at Warwick. The administrative and support staff were employees of the emergency clinic.

The corporation, like all other corporations, was required to deduct federal income tax and Social Security taxes from the salaries of its employees and hold those funds in trust to forward to the Internal Revenue Service on a quarterly basis with the requisite documentation. Though Ms. Linstrom worked with Dr. Stewart and Mr. Hebert in creating the corporation, Dr. Stewart, as the only officer of the corporation, executed all of the documents. Seed money for the corporation came from a loan guaranteed by the United States Small Business Administration from the Fleet National Bank and was secured by Dr. Stewart's home and the home of his parents. A later loan of $25,000 was also secured by Dr. Stewart's home. The emergency clinic also had a checking account at Fleet National Bank with Dr. Stewart as the sole authorized signatory.

With but a few exceptions, the emergency clinic operated as Dr. Stewart had envisaged and planned. He and the other doctors addressed solely the medical matters and Ms. Linstrom, shortly to become Mrs. Stewart, assumed full responsibility for the business aspects of the corporation. There is no doubt that Mrs. Stewart processed insurance forms, paid creditors, billed debtors and made all decisions as to who would be paid, when and how much. The latter described responsibility became significant because the emergency clinic had continual cash flow problems throughout its existence, thus, not all creditors could be paid in the full amount, if at all, within each billing period. Mrs. Stewart also had responsibility over payroll preparation and income and FICA withholdings. Initially, Mr. Hebert suggested that the emergency clinic use a payroll service. All that was needed thereunder was for Mrs. Stewart or Mrs. Karen Karacus, a staff employee under Mrs. Stewart's supervision, to telephone the payroll service and report the number of hours each employee had worked. The payroll services then computed the salary for the pay period, made the necessary state, federal and FICA deductions and sent either the checks or a report to be used by Mrs. Stewart in distributing the payroll checks.

At the outset, Mr. Hebert's firm provided Mrs. Stewart with the necessary income and FICA tax deduction information and kept the general ledger. Unfortunately, as capable as Mrs. Stewart was in her dealings with insurance, billings, collections, and other administrative matters, she had never been trained in the art or the science of bookkeeping. During 1981, Mr. Hebert's firm computed the clinic's tax liability and prepared the accompanying forms which Dr. Stewart signed. Thereafter, Mrs. Stewart signed and prepared the forms in her name, as "Administrator," which she then submitted to IRS with a check for the proper amount due being either "signed" with a rubber stamp of Dr. Stewart's name or by Mrs. Stewart simply signing Dr. Stewart's name. In 1982, Mr. Hebert's firm stopped computing and processing the tax figures and forms for the

**4**

emergency clinic. Mrs. Stewart completed the tax forms for the first two quarters of 1982, but did not send checks to the Internal Revenue Service for the requisite amounts.[1] Mrs. Stewart never told Dr. Stewart about this problem. Mrs. Stewart did not prepare or file tax forms for the rest of 1982 and 1983. She did, however, continue to pay other creditors and meet the payroll. She or Dr. Stewart also drew funds for personal living expenses.

In October of 1983, Mr. Richard Pion, a Revenue Agent of the Internal Revenue Service was alerted to the non-payment of taxes by the emergency clinic and assigned the task of recovering the funds owed to the United States. After a rather cursory investigation, Mr. Pion determined that both Dr. and Mrs. Stewart were responsible persons pursuant to 26 U.S.C. § 6672 (1982) and its judicial interpretations, thus holding each of them liable for a penalty equal to 100 percent of the unpaid taxes, which was then in excess of $96,000. Mr. Pion recommended that the 100 percent penalty be assessed against Dr. Stewart because as president, treasurer and sole stockholder, he had "abandoned" his corporate responsibilities to his bookkeeper. Mr. Pion knew that Dr. Stewart had given Mrs. Stewart a rubber stamp with his name, but he nevertheless found that, "an analysis of the checks provided shows that Dr. Stewart personally signed a great many of the corporate checks."[2] Mr. Pion also found that Dr. Stewart was responsible for managing corporate affairs and tax matters and that Dr. Stewart acted wilfully in not paying FICA withholding to the Internal Revenue Service as well as other withheld federal taxes. Mr. Pion also found Mrs. Stewart to be a responsible person who had wilfully preferred other creditors over the United States. Upon her attorney's recommendation, Mrs. Stewart entered into a stipulation of judgment approximately a year and a half ago conceding that she was a respon-

sible person and, therefore, liable for the $96,000 penalty. Interestingly, neither Mr. Pion nor any other IRS employee has made any attempt to collect any funds from Mrs. Stewart to date.

### DISCUSSION

The controlling statute in this case, 26 U.S.C. § 6672 (1982), states that

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who wilfully fails to collect such tax or truthfully account for and pay over such tax or willingly attempts in any manner to evade or defeat any such tax or the payment thereof shall in addition to other penalties provided by law be liable to a penalty equal to the total amount of the tax evaded or not collected or not accounted for and paid over.

■ The purpose of section 6672 is to permit the IRS to pierce the corporate veil to reach the individual(s) who are responsible for a corporation's failure to pay its duly owed taxes, *White v. United States*, 178 Ct.Cl. 765–771, 372 F.2d 513, 516 (1967). For Dr. Stewart to be penalized, two statutory requirements must be met. First, he must be found to be a "responsible person," *Godfrey v. United States*, 748 F.2d 1568, 1574 (Fed.Cir.1984), and second to have wilfully failed to collect, truthfully account for, and pay over or have wilfully evaded or defeated withholding and FICA tax payments. *Id.* This is an inquiry into substance over form. *Id.* at 1576. In this case, the court is authorized to peer behind the facade of the emergency clinic and the titles assigned to Dr. Stewart to determine whether or not he was "a person responsible" for the clinic's failure to meet section 6672. This determination is especially dependent on the facts, but prior case law is useful to illustrate who may be deemed "responsible." *See Bauer v. Unit-*

---

1. Mr. Hebert advised Mrs. Stewart to take this course of action because it was necessary to file the forms even if she did not have the money to pay the tax. According to Mrs. Stewart, Mr. Hebert told her, "The IRS will contact you about a payment plan."

2. Mr. Pion upon being questioned at trial about his findings had to agree that this was not the case. He nevertheless adhered to his original decision that Dr. Stewart was a responsible person.

*ed States,* 211 Ct.Cl. 276, 543 F.2d 142, 148 (1976).

■ In most instances, the responsible person is defined as the person who has the final word as to what bills or creditors should be paid, when, and how much. *Bauer,* 543 F.2d at 143. Such a person is under the duty to "perform the act in respect of which the violation occurs," *i.e.,* "to collect, account for and pay over" any taxes, 26 U.S.C. section 6672, and has the ultimate authority over the expenditure of funds. *Godfrey,* 748 F.2d at 1575. Thus, Dr. Stewart's duty under section 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds. The law permits the court to find more than one responsible person. *Id.*[3]

The court believes that this is a case of first impression under federal law in that it has been unable to find any other reported case in which the corporate shield of a profession service corporation incorporated under the laws of Rhode Island or similar laws elsewhere have been pierced for this purpose.

■ A general corporation of any size usually has at least several officers and senior employees with designated duties that overlap. To the extent that there is an overlap in the duty to withhold and payover federal income and FICA taxes to the Internal Revenue Service, more than one person could be found liable under section 6672. Here, however, we are faced with a corporation owned completely by one person whose profession lies in the art of medicine, not business administration. There is precious little legislative history to the Rhode Island Professional Service Corporation Act of 1985, but the court cannot ascribe to the charge of defendant, especially made through its witness, Mr. Pion, that Dr. Stewart by virtue of his sole ownership of the emergency room could not relegate final authority over non-professional matters to an apparently proven and trusted employee. The mere holding of an office within a corporation does not of it-self render a person responsible for the collection and paying over of employee withholding taxes. *Bauer,* 543 F.2d at 149. Even if ten doctors owned the emergency clinic there was no assurance that any one of them would know how to administer the business needs of the corporation, let alone know the intricacies of payroll withholding procedures. That is exactly why professional corporations, such as law firms with which this court is more familiar, employ administrators. The court applauds Dr. Stewart's acknowledgement that he had no expertise in such business matters and his prudence in hiring another apparently competent individual to oversee the business matters of his corporation.

■ This court, after closely observing the witnesses, has arrived at a number of key findings. While it is true that Dr. Stewart played a business role at the time of the formation of the corporation, Mrs. Stewart quite literally controlled solely the business aspects of the emergency clinic. Even when Dr. Stewart was securing financing, and incorporating the clinic, Mrs. Stewart was present. She even helped design the facility. Every day the emergency clinic was in business, she made decisions that would normally only be entrusted to an officer or director of a corporation. That, the court believes was the understanding of the parties from the outset. Dr. Stewart had divorced himself from the business side of the emergency center. This is apparent to any reasonable observer, not only from Dr. Stewart's lack of involvement and interest in business matters, but Mrs. Stewart's complete control of all administrative functions. She and she alone made administrative decisions for the corporation. Dr. Stewart was by their choice, and in fact, a nominal figure of authority in the business area. See *Bauer,* 543 F.2d at 148, 149.

While Dr. Stewart had the authority to sign checks, Mrs. Stewart had custody and control over the corporation checkbook. She both stamped and signed Dr. Stewart's

---

3. Defendant argued at trial that *Godfrey* was not applicable factually to the case at bar. That is indeed the case, but the discussion of the law of the responsible person in *Godfrey* is just as applicable here as it was there.

names on checks, tax returns and other documents. She even signed her name in a number of instances in the capacity of "Administrator." Dr. Stewart signed checks but rarely. His signing of checks was simply a ministerial act. *Godfrey*, 748 F.2d at 1668.

Even when Dr. Stewart did enter the realm of Mrs. Stewart's administrative domain, she clearly controlled the situation. While Mrs. Stewart was on maternity leave, Mr. Follett, owner of the x-ray machine leased to the clinic contacted Dr. Stewart and convinced him to make delinquent lease payments. Dr. Stewart asked Ms. Karacus if the company had the money in its account to which Ms. Karacus answered in the affirmative. Dr. Stewart then instructed her to pay Mr. Follett. While testimony as to Mrs. Stewart's response to this was somewhat muddled, it was clear that she was very angry at Dr. Stewart's instructions and would have rescinded them had the check not already been sent. The court also finds without hesitation that she would have had the authority to have rescinded his instructions. Mrs. Stewart acted as the manager of the corporation's fiscal affairs and exercised authority over the general business policy and finances of the corporation. *Godfrey*, 748 F.2d at 1575. Even when she was on maternity leave, she continued to make the business decisions for as long as she could. Ms. Karacus, who acted directly under Mrs. Stewart, testified that Mrs. Stewart called the office at least once a day or every other day most of the time that she was in the hospital. Ms. Karacus' testimony further confirmed that Mrs. Stewart handled all administrative affairs. Ms. Karacus had absolutely no business contact with Dr. Stewart in Mrs. Stewart's absence with but the one exception as noted above. Ms. Karacus confirmed that Mrs. Stewart decided which creditors would be paid and in so doing never asked Dr. Stewart about any business matter that she knew of. According to Ms. Karacus, Mrs. Stewart made all the business decisions and they were final. Dr. Stewart made none of those decisions, nor did she believe that he was even aware of administrative matters.

During his testimony, Dr. Stewart stated that he never wanted to have anything to do with the business aspects of the clinic but that on occasion he would ask how things were going financially. Mrs. Stewart invariably answered, "Fine." Dr. Stewart also overheard Mrs. Stewart tell a banker at Fleet National Bank, when asked about taxes, that all income and payroll taxes were being paid. The court now knows that this was not the case. Dr. Stewart, in his counsel's language, was not uninformed, he was misinformed.

As to the hiring and firing of employees, Dr. Stewart hired one lab technician and apparently one doctor as an independent contractor. Mrs. Stewart hired all other employees, including doctors. All of this was but a reflection of the understanding between Dr. and Mrs. Stewart. Mrs. Stewart was to handle all business and administrative matters so Dr. Stewart could devote himself to that which he did best, emergency medical treatment.

Much reliance was given by defendant to the testimony of Mr. Pion that Dr. Stewart was a responsible person for section 6672 purposes. He was told by all he interviewed that Mrs. Stewart ran the business end of the clinic, decided who would be paid, when and how much. She, not Dr. Stewart, made the decision not to remit the withheld income and FICA taxes. Mr. Pion's conclusion that Dr. Stewart had to be a responsible person because he was the only officer of the corporation, and the by-laws placed the entire duty over financial affairs on him, is specious and shortsighted. The court believes that Mr. Pion wore blinders in this case. He refused to look beyond the veneer of the corporation. Remarkably, Mr. Pion had never even heard of a professional service corporation until the day he testified, according to his testimony. He did not even know that Mrs. Stewart could not by law be an officer of the corporation. Mr. Pion's statement that Dr. Stewart could not by operation of law abrogate his duties as treasurer to Mrs. Stewart was simply wrong. Dr. Stewart, as sole owner of a Rhode Island professional services corporation, not only could

but did do exactly that. This court believes that to the extent that Mr. Pion's testimony expressed his true feelings towards taxpayers that he is incapable of making unbiased objective decisions.

After a review of the facts and testimony, the court finds that Dr. Stewart was not a responsible person for section 6672 purposes. Dr. Stewart was at best only a nominal figure of authority in the fiscal and business aspects of the clinic. Had the clinic not been a professional services corporation, Mrs. Stewart would have been treasurer and in all likelihood vice president with the full autonomy over the day-to-day business aspects of the company. Since she could not be an officer, she simply exercised that very same authority and autonomy as administrator of the clinic.

The evidence established that Dr. Stewart had no control over corporate business matters, including control of the checkbook, the payment of creditors, the hiring and firing of employees and the dispersement of corporate funds. Dr. Stewart had absolutely no responsibility over the preparation or payment of the payroll, nor did Dr. Stewart have the final word as to what bills or creditors should or should not be paid. Because the court finds that Dr. Stewart was not a responsible person, the court need not address the issue of wilfulness in failing to make withheld income and FICA payments to the United States.

## CONCLUSION

The court, for the reasons given, finds in favor of plaintiff. Defendant is directed to refund to plaintiff funds paid pursuant to the assessment plus any additional amounts to which he is entitled. The Clerk of the court is directed to enter judgment accordingly. Costs are awarded to plaintiff.