USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-1510

 MITCHELL ADAMS, AS HE IS THE 
 MASSACHUSETTS COMMISSIONER OF REVENUE,

 Plaintiff, Appellant,

 v.

 ROBERT P. COVENEY,

 Defendant, Appellee.

 [Hon. George A. O'Toole, Jr., U.S. District Judge]

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 Before

 Boudin, Circuit Judge,
 Bownes, Senior Circuit Judge,
 and Reavley*, Senior Circuit Judge.
 

 Edward J. DeAngelo, Assistant Attorney General, with whom
Scott Harshbarger, Attorney General, was on brief for appellant.

 Arthur P. Bergeron for appellee.

 
 
 December 4, 1998
 
 
 
 
____________________

 *Of the Fifth Circuit, sitting by designation. BOWNES, Senior Circuit Judge. The United States
Bankruptcy Court for the District of Massachusetts determined that
Robert P. Coveney was not personally liable for state taxes
incurred by a corporation of which he served as president where the
authority and responsibility for paying the taxes had been given
exclusively to the treasurer. The Massachusetts Commissioner of
Revenue (the "Commissioner") challenged that conclusion in federal
district court. The district court affirmed. The Commissioner now
appeals from the district court's decision to uphold the bankruptcy
court's order. We affirm.
 I.
 On or about May 5, 1983, Coveney and his long-time friend
Lawrence Glynn formed Covynn, Inc. ("Covynn"), a Massachusetts
corporation, to own and operate the Piave Square Pub. Ownership of
the real estate was taken in the name of Piave Realty Trust. 
Coveney held the title of president of the corporation, while Glynn
served as the treasurer. Each of them, including their wives, held
the office of director and owned one-quarter of the corporate
stock. An oral agreement the existence of which is not disputed
 governed the division of labor between the officers. Glynn, who
was a practicing lawyer and certified public accountant, was to be
exclusively responsible for preparing and filing necessary tax
returns and ensuring that taxes, mortgage, payroll, and insurance
payments were timely made. Coveney, who had experience in food
services, would take sole responsibility for the day-to-day
management of the pub, including hiring and firing employees and
paying the pub's suppliers. 
 In 1986, the corporation purchased the Oxford Restaurant. 
This restaurant too was operated under the same bifurcated
arrangement. Eventually, Glynn and Coveney decided that the
workload was too much for Coveney, and that Coveney's duties would
henceforth be limited to overseeing the Oxford Restaurant. The
corporation subsequently leased the Piave Square Pub to two of
Glynn's brothers. For a few years, the corporation prospered under
the business arrangement. Then disaster struck. Glynn twice
admitted to Coveney that he had fallen behind in paying state taxes
owed by Covynn, the first time in the spring of 1988 and the second
time in early 1989. On each occasion, Coveney accepted Glynn's
suggestions for keeping the corporation afloat. In the spring of
1988, Glynn informed Coveney that Covynn owed approximately
$200,000 in back taxes. On June 6, 1988, Coveney and Glynn
borrowed $200,000 from Glynn's mother to pay off the tax liability. 
Coveney and Glynn co-signed a note for $200,000, which was secured
by a mortgage on the property of the Oxford Restaurant. 
 Believing the crisis resolved, Coveney returned to daily
management of the Oxford Restaurant. During the next several
weeks, Coveney asked Glynn on several occasions whether corporate
taxes were being kept current. Each time, Glynn assured Coveney
that the taxes were being paid on time. Glynn changed his tune a
few months later, however, acknowledging that he had again fallen
behind in paying Covynn's taxes. In March 1989, Glynn told Coveney
that he paid the due taxes from an escrow account maintained for
his non-Covynn legal clients, and that the money had to be
immediately returned to the fund. Coveney was shocked at the new
developments, but again agreed to help Glynn out of the
predicament. The two borrowed an additional $210,000 from Glynn's
mother. This time, Coveney secured the loan by mortgaging his own
home.
 By mid-1989, the business had completely unraveled. 
Covynn filed for bankruptcy. Creditors began to sue Covynn, naming
Coveney as a codefendant; protracted bankruptcy proceedings and
related litigation commenced. In April 1994, the Commissioner
informed Coveney that the Commonwealth deemed him liable for
Covynn's unpaid meals and withholding taxes from January 1, 1988
through August 31, 1989. By this time, Coveney and his wife had
filed for Chapter 13 protection. Accordingly, the Commissioner
filed a proof of claim against Coveney for $63,144.64 and later
amended his claim upward. All told, the Commissioner sought to
recover $251,527.03 in corporate back taxes from Coveney.
 The United States Bankruptcy Court for the District of
Massachusetts disallowed the Commissioner's claim, finding that
Coveney had no "duty to pay over the taxes" under Massachusetts law
because his obligations to the corporation "were confined to
supervising the restaurant's operations" and did not extend to
preparing tax returns or paying taxes. In re Coveney, 202 B.R.
801, 804 (Bankr. D. Mass. 1996). The court found Coveney to be a
victim of "a callous breach of . . . trust by his business
partner." Id. at 802. 
 The Commissioner subsequently appealed the adverse
decision to the district court. The district court held that the
bankruptcy court erred insofar as it refused to look to federal law
on the central question of liability, but concluded that the
outcome would have been the same had it done so and affirmed the
judgment. This appeal ensued.
 II.
 We review the bankruptcy court's ruling de novo,
deferring to its factual findings unless they are clearly
erroneous. See 28 U.S.C. 158(d). We consider the district
court's reasoning where it is persuasive, but otherwise accord no
"special deference" to the court's analysis. See Palmacci v.
Umpierrez, 121 F.3d 781, 785 (1st Cir. 1997).
 Under Massachusetts law, an employer who fails to
withhold or pay employee taxes is liable to the Commonwealth for
those unpaid taxes. The term "employer" as used in the statute
includes "an officer or employee of a corporation . . . who as such
officer [or] employee . . . is under a duty to withhold and pay
over taxes." Mass. Gen. Laws ch. 62B, 5 (1988). In like
fashion, liability for nonpayment of meals taxes may be imposed on
any "officer or employee of a corporation . . . who as such officer
[or] employee . . . is under a duty to pay over the taxes." Mass.
Gen. Laws ch. 64H, 16 (1988). 
 The Commissioner has promulgated regulations defining "a
duty to pay over" as 
 an obligation to remit taxes that arises from
 a person's position, function, or
 responsibility undertaken on behalf of a
 corporation or partnership. Such obligation
 need not be a legally enforceable agreement
 between the corporation or partnership and the
 responsible person. 
Mass. Regs. Code tit. 830, 62C.31A.1(2) (1998). Whether a duty
to pay exists must be determined "based on the facts and
circumstances of the individual case." Mass. Regs. Code tit. 830,
 62C.31A.1(4). As the bankruptcy court correctly observed, under
the governing statute and regulations, the mere fact of holding
corporate office, standing alone, is insufficient to create a duty
to pay.
 There is no comprehensive or uniform set of factors that
must be evaluated in deciding if an individual has a personal duty
to pay corporate taxes. In Commissioner v. Brown, 673 N.E.2d 1225
(Mass. 1997), the Supreme Judicial Court recognized the absence of
any "list[] [of] factors" bearing on the question of duty and
analyzed the facts before it in light of the federal law's focus on
whether the assessed individual "had the authority to have the
taxes paid." 673 N.E.2d at 1227. Based on the court's
consideration of federal law, the Commissioner contends that the
Supreme Judicial Court has fully embraced the federal approach in
interpreting state tax laws. Relying on Brown, the Commissioner
seeks the benefit of the federal "responsible person" test, which
broadly extends tax liability under the Internal Revenue Code to
"all with the responsibility and authority to avoid the default"
who wilfully fail to pay. Vinick v. Commissioner, 110 F.3d 168,
172 (1st Cir. 1997). 
 Although the court in Brown sought guidance from federal
law in interpreting Chapter 62B, section 5 and Chapter 64H, section
16, we must be wary of reading too much into the court's decision
to look to federal cases for the following reasons. The court did
not explicitly adopt the federal "responsible person" standard. 
Nor did it say that the phrase "duty to pay over" under state law
ought to be read as expansively as many federal courts including
this Circuit have construed the "responsible person" test. 
Rather, it observed only that "there is a close parallel between
the State and Federal statutes concerning the duty to pay over." 
Brown, 673 N.E.2d at 1227. While federal courts often construe the
"responsible person" standard quite broadly, treating it as merely
a threshold inquiry, Massachusetts courts interpreting their own
laws have placed a greater emphasis on whether the individual at
issue was responsible for paying the taxes. Indeed, the Browncourt considered not only whether the assessed individual had the
authority to pay over the taxes, but also whether it was his
responsibility either to remit the taxes or to supervise payment of
the taxes. See id.
 Further, the usefulness of federal cases may be somewhat
complicated by the fact that the federal approach requires an
additional showing of "wilfulness," which is not required by
Massachusetts law. The Supreme Judicial Court has not had occasion
to explore this difference in detail. 
 For these reasons, we do not read Brown to adopt federal
law wholesale so as to render synonymous the two standards. 
Instead, we look to federal cases only for secondary persuasive
authority. But we must focus on Massachusetts precedent,
following its lead as to how to apply the "duty to pay over"
standard. 
 In practice, Massachusetts courts have not set forth a
single set of factors to be applied in all cases, but instead have
conducted a case-by-case inquiry, weighing a variety of
circumstances, including the formal governing framework within the
corporation, whether the alleged debtor bore explicit
responsibility for paying the taxes, the degree to which the
individual actually exercised control over the corporation's
financial affairs, and whether the assessed individual knew of the
tax default. See, e.g., Berenson v. Commissioner, 604 N.E.2d 704,
705 (Mass. 1992) (assessed individual was president, treasurer, and
"the person responsible for paying sales taxes"); Fox v.
Commissioner, No. 194544, slip op. 688, 700 (Mass. App. Tax Bd.
June 30, 1998) (imposing personal liability on individual serving
as president and treasurer who exerted control over which creditors
to pay, regularly discussed the companies' sales tax liabilities,
and "was informed of the companies' cash needs on a daily basis");
cf. Godfrey v. United States, 748 F.2d 1568 (Fed. Cir. 1984)
(chairman of board not responsible person under federal law in
absence of evidence that he "had or exercised control of the
collection, accounting for, and payment over of taxes"). 
 The recent case of Commissioner v. Brown, 673 N.E.2d
1225, provides the best guidance. In Brown, the Commissioner
sought to hold the treasurer of a corporation accountable for the
corporation's unpaid sales taxes. The Commonwealth's Appellate Tax
Board rebuffed the Commissioner's efforts, ruling that Brown was
under no duty to pay over the sales taxes. On appeal, the Supreme
Judicial Court agreed that Brown was not personally liable for the
taxes. Acknowledging that Brown was the corporation's treasurer
and had check-signing authority, the court nevertheless found
dispositive that "it was not his job to pay over the taxes," that
he did not, in fact, have supervisory responsibility for payment of
the taxes, and that he "had no decision-making authority over the
disbursement of the funds." 673 N.E.2d at 1227.
 The reasoning of Brown compels a similar finding of no
liability in this case. Here, a binding agreement between the two
officers of the corporation (albeit an oral one) imposed the
exclusive duty to pay the corporation's taxes on Glynn, not
Coveney. The existence of such an explicit arrangement
distinguishes this case from the typical case where a duty to pay
over must be inferred from often conflicting circumstances and in
the absence of a clear delineation of corporate responsibilities. 
See id. at 1227 ("The answer would be easily arrived at . . . if an
individual had been given express authority to pay over taxes as
part of his or her regular activities."). The officers' oral
agreement here not only placed the tax-paying responsibility
squarely upon Glynn's shoulders, but by implication, withdrew the
same authority and responsibility from Coveney. "The separation of
authority within a business enterprise, and the limitation on
authority held by officers is a practical reality which is
acknowledged and given effect by the courts." O'Connor v. United
States, 956 F.2d 48, 51 (4th Cir. 1992); see also Godfrey, 748 F.2d
at 1576 ("The courts recognize the normal division of and
limitations on authority exercised by various representatives of a
particular business."); Bauer v. United States, 543 F.2d 142, 149
(Ct. Cl. 1976) (same).
 The actual practice of the officers confirms this
division of labor. Each person's corporate duties were strictly
confined to his area of expertise: Coveney to food service and
restaurant management and Glynn to meeting the corporation's
general legal and financial obligations. Consistent with the
governing arrangement, Coveney never prepared or filed a tax return
nor did he sign a single tax check. Like the corporate officer in
Brown, Coveney had general check-signing authority, but never once
actually exercised that power in connection with or intruded in any
way upon Glynn's exclusive tasks of paying the corporation's
mortgage, tax, and payroll liabilities. See O'Connor, 956 F.2d at
51 ("Most corporate officers probably do have the authority to make
disbursements . . . . The focus must instead be on substance
rather than form."). Moreover, the two officers did not routinely
discuss the corporation's tax liability. Coveney was kept in the
dark about the corporation's dire financial straits until disaster
loomed. See Fox, slip op. at 700. Virtually all of the relevant
tax, payroll, mortgage, and insurance records were maintained by
Glynn off-site. These circumstances amply support the bankruptcy
court's determination that Coveney had no duty to pay over the
taxes. 
 We would reach the same conclusion even if we were to
rely more heavily on federal case law. The Commissioner cites
various federal cases for the proposition that a responsible person
may not delegate the duty to pay taxes to another. See, e.g.,
Keller v. United States, 46 F.3d 851, 854 (8th Cir. 1995). That
principle, however, assumes a preexisting duty to pay. We find no
such obligation here. The cases cited by the Commissioner,
moreover, involved corporate officers who possessed "significant"
or "ultimate" control over the corporate finances such that the
person "can fairly be said to be responsible for the corporation's
failure to pay over its taxes." Kinnie v. United States, 994 F.2d
279, 283 (6th Cir. 1993). By contrast, Coveney's authority over
financial affairs was strictly limited to paying suppliers. 
Despite his title as president, he owned no more stock than any of
the other directors; he did not reserve power over other corporate
matters; and he never expanded his discrete authority by involving
himself more deeply in the corporation's legal and financial
obligations. Coveney did not have final authority over the
corporation's finances or sufficient responsibility for paying
taxes such that he "can fairly be said" to have "had the authority
to have the taxes paid." Brown, 673 N.E.2d at 1227. 
 The Commissioner, turning to what he believes to be his
ace-in-the-hole, urges us to draw an adverse inference from
Coveney's willingness to twice remedy the corporation's tax deficit
 if we were to accept the Commissioner's version of the facts,
Coveney's actions would show that he had taken on an individual
duty to pay the corporation's taxes. Neither the bankruptcy court
nor the district court saw fit to draw such a conclusion, however,
and we see no error in their refusal to make such an inferential
leap. To us, Coveney's decision to place his personal finances at
greater risk reveals nothing more than his natural desire to
maintain the financial viability of the corporation of which he was
a co-founder. He was not fulfilling Glynn's corporate functions or
undertaking new ones. 
 We believe the bankruptcy court correctly held that
Coveney had no individual duty under state law to pay corporate
withholding and meals taxes to the Commonwealth. 
 Affirmed. Costs on appeal awarded to appellee.